## THE EAGLE POINT.

(Circuit Court of Appeals, Third Circuit. February 3, 1903.)

### No. 22.

1. COLLISION—STEAMERS CROSSING—EXCESSIVE SPEED IN FOG.

In a suit for collision in the night between the Atlantic steamships Biela and Eagle Point, 150 miles east of Sandy Hook, while on crossing courses, a finding that there was a fog at the time and place of collision so dense that the two vessels could not see each other until within 250 yards, and that the Biela was therefore in fault for maintaining full speed and failing to give fog signals, *held* supported by the evidence, but a finding that the Eagle Point was not in fault for excessive speed *held* erroneous.

2. SAME—VIOLATION OF RULE AS TO SPEED.

Under article 16 of the international navigation rules [U. S. Comp. St. 1901, p. 2868], which provides that "every vessel shall in a fog, mist, falling snow or rain storms go at a moderate speed, having careful regard to the existing circumstances and conditions," a speed of eight miles an hour by a steamship proceeding in the night and in a dense fog, 150 miles east of Sandy Hook, in the customary track of transatlantic steamers, is not a moderate speed; nor can such speed be justified on the expressed opinion of her officers that she could not see properly controlled at a lower rate of speed. The requirement of the rule is absolute, and liability for a collision caused or contributed to by its violation cannot be avoided because a vessel is so constructed or is running so light that she cannot be navigated at such a slow speed as will comply with such requirement.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 114 Fed. 971.

Charles C. Burlingham, for appellant.

H. G. Ward, for interveners.

Wilhemus Mynderse, for appellee.

Before ACHESON, DALLAS and GRAY, Circuit Judges.

ACHESON, Circuit Judge. This was a suit in admiralty brought by the Liverpool, Brazil & River Plate Steam Navigation Company, Limited, as owner of the British steamship Biela, and as carrier of her cargo and trustee for her passengers, master, officers, and crew, against the British steamship Eagle Point, to recover damages sustained by reason of a collision between these vessels, which occurred about 1 o'clock on the morning of October 1, 1900, on the Atlantic Ocean, about 150 miles east of Sandy Hook, resulting in the total loss of the Biela and her cargo. The Eagle Point having been attached, the Norfolk & North American Steam Shipping Company, Limited, as owner and claimant, intervened and defended the suit. The district court rendered a decree dismissing the libel, from which decree the libelant appealed. Since the appeal was taken, several of the cargo owners intervened as colibelants and appellants. The Biela was bound on a voyage from New York to Liverpool, laden with a general cargo.

¶ 2. Collision rules as to speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.

120 F.—29

She was of 2,182 tons gross, 1,344 tons net, 316 feet in length, nearly 35 feet in breadth, and about 29 feet deep. The Eagle Point was bound on a voyage from London to Philadelphia, carrying only 300 tons of cargo. She is of 5,221 tons gross, 3,307 tons net, in length 410 feet, in breadth 51 feet, and in depth 31 feet. Before the collision the vessels were on crossing courses, the course of the Biela being E. by ½ S. magnetic, or E. ¾ S. true, and the course of the Eagle Point being S. 75° W. magnetic, or S. 65° true. These courses were maintained by the steamers until immediately before the collision. The Biela was making about 9 knots an hour,—her full speed. The Eagle Point (whose full speed is nearly 12 knots an hour) was proceeding on this occasion at a speed of not less than 8 knots an hour. The bow of the Eagle Point struck the port side of the Biela at or near her main hatch, cutting into her so far that the Biela was in a sinking condition when the Eagle Point backed out. The Biela sank in less than half an hour. Her officers, crew, and passengers escaped in her boats, and were taken on board the Eagle Point. The bow of the Eagle Point was badly damaged, but she was able to proceed on her voyage, reaching Philadelphia in due course.

The primary question in the case is whether at the time and place of collision the weather was such that lights could be seen at a considerable distance, as alleged by the libelant, or was densely foggy, as alleged by the respondent. The district judge stated the question arising upon the conflicting allegations of the parties thus: "Whether there was a fog at the time and place of collision so dense that the vessels could not see each other farther away than, say, 250 yards, or whether the night, although dark and overcast, was nevertheless clear enough to permit the lights of each vessel to be seen from the other at a distance of several miles." The district court found that at the time and place of collision there was a dense fog through which the vessels were running, and that the Biela "was steaming at full speed through the fog without giving the signals required by the international rules," and hence was in fault. In respect to the Eagle Point, the finding of the court was as follows:

"In the present case the undisputed evidence proves that the Eagle Point was very light, carrying only about 300 tons of cargo, and that such a ship carrying so small a load could not be properly controlled at a lower rate of speed than the rate at which she was proceeding. Positive testimony to this effect was given on behalf of the Eagle Point, and no witness was offered in denial. This is in effect an admission that the testimony on this point is true, and I find, therefore, that the speed at which the Eagle Point was steaming was a moderate speed, not greater than was proper under the surrounding circumstances. I see no ground upon which it can be held that she was guilty of negligence that contributed to the collision."

The conclusion reached by the district court, that a dense fog prevailed before and at the time when the vessels came together, was fully warranted, we think, by the proofs. Upon the question of the condition of the weather, the clear weight of evidence, both direct and circumstantial, it seems to us, is with the Eagle Point. We concur in the finding that the two steamers were running in a dense fog. Now, undoubtedly, the Biela was proceeding at the rate of nine knots an hour—her full speed—without giving the required fog signals. She

was then in fault, and that fault must be held to have contributed to the collision. Thus far we agree with the findings and judgment of the district court.

But was the court right in exculpating the Eagle Point? She, indeed, was giving proper fog signals, and it may be conceded that, after the lights of the Biela were perceived by those charged with the navigation of the Eagle Point, they did everything possible in the emergency to avoid the collision. The question, however, whether the Eagle Point was going at a moderate speed, with due regard to the existing circumstances and conditions, remains to be considered. The answer of the owner and claimant of the Eagle Point contains the following statements:

"At about 1:10 o'clock deck time, and 12:45 o'clock corrected time, in the morning of October 1, 1900, while the Eagle Point was thus proceeding upon her course, the white masthead light of a vessel which subsequently proved to be the Biela was dimly discerned through the fog, bearing about a point on the starboard bow of the Eagle Point. It was seen by the lookout, and by the officer in charge of the bridge of the Eagle Point, as soon as it could be seen from their respective stations, considering the character of the light and the density of the fog, and it was duly reported."

"At the time of discovering the masthead light of the Biela, the officer in charge of the bridge of the Eagle Point was in the act of blowing a regular fog signal. This signal he sounded, and immediately thereupon the red side light of the Biela came into his view, which was as soon as the light could be seen by him, considering the character of the light and the density of the fog. The distance between the two vessels cannot be accurately stated; but it is believed that the distance at this time did not exceed two hundred and fifty yards. The fog existing at the time was of such density as to prevent the white light of the Biela from being seen at a greater distance than about three hundred yards."

The foregoing statements and the following quotations from the testimony of the lookout (Moores) and the second officer (Linklater), who was in charge of the bridge of the Eagle Point,—witnesses in her behalf,—serve to illustrate the then existing circumstances and conditions as alleged by the respondent. The outlook, who was on duty from midnight until 2 o'clock, testified thus:

"Q. What kind of weather was it when you went on duty at midnight? A. Very thick fog. Q. What was the first you knew about any approaching vessel? A. The first I knew was a white light I saw first. Q. Whereaway was that light? A. I should think about 150 yards from us."

The second officer testified thus:

"Q. When you saw the loom of these two lights—the white light and the red light—could you form any estimate as to whether they were far away or near you? A. I thought it was pretty close; about a length and a half away. Q. That was the judgment you formed at the time? A. Yes. Until I saw the red light I didn't know how far she was away, or what the light was, or anything at all about it. * * * Q. I suppose you have had some experience in fog before this voyage? A. Yes, I have had a good deal. Q. You call it a dense fog, do you? A. I call it a dense fog; yes. Q. How far could you see a bright masthead light that night, do you think? A. Now, I should think I ought to see a light two of our ship's lengths. Q. No more than that? A. I shouldn't think so. Q. 800 feet? A. 800 feet; I mean judging now. Q. How are you judging now? A. I mean now; I mean that is all I could see, 800 feet. * * * Q. Are you able to estimate the distance the two vessels were apart when you first saw the masthead light of the Biela? A. I think now that it was about two lengths away. Q. Eight hundred feet?

A. Eight hundred feet; two of our ship's lengths. At the time I couldn't estimate the distance at all, but that is what I think now."

According to this testimony, the fog was so dense that a bright masthead light was not discernible at a greater distance than 800 feet, and by the admission of the answer the distance between the vessels when the second officer of the Eagle Point perceived the red light of the Biela did not exceed 750 feet. But the distance between the Eagle Point and the place of collision was still less, for both vessels were moving on the crossing courses above stated. Now, the speed of the Eagle Point was not less than 800 feet a minute. It is, therefore, not surprising that the collision was not averted, notwithstanding the wheel of the Eagle Point was promptly put hard aport and her engines reversed full speed. The truth is, the Eagle Point's rate of speed was so great that after the Biela was seen it was impossible to prevent the disaster. The Eagle Point was only 150 miles east of Sandy Hook, and was in the frequented track of commerce. It is worthy of note that the steamship Elise Marie was following the Biela, a short distance to rearward, and that, during the brief time the Eagle Point was delayed (her master stated it was "about three-quarters of an hour"), fog signals were heard off her port bow and off her starboard quarter from passing steamers. The courts on both sides of the Atlantic have recognized this locality as one where the presence of other vessels may reasonably be expected, and as calling for the greatest care in case of fog to avoid collisions. The Pennsylvania, 9 Blatch. 451, Fed. Cas. No. 10,950; Id. 19 Wall. 125, 133, 22 L. Ed. 148; Id. 23 Law T. (N. S.) 55, 57.

The case of The Pennsylvania, supra, is instructive. There a collision occurred in a thick fog between a sailing bark and a large steamer, about 200 miles east of Sandy Hook. The bark was moving slowly, ringing a bell, but not using a fog horn, as required by the navigation rules. The steamer was going at the rate of seven knots an hour. The privy council gave judgment against the steamer as alone responsible for the collision. 23 Law T. (N. S.) 55, 57. Lord Romilly, master of the rolls, in delivering the opinion of the privy council, after stating that the rate of speed "must always have reference to the peculiar circumstances of the case," said:

"But their lordships are of opinion that in a thick fog in the Atlantic Ocean, in the direct line to New York, about 200 miles to the east of Sandy Hook, where frequently there must be a great number of vessels congregated, seven knots an hour is too great a speed for a steamer to proceed at. It was argued that if their lordships held that seven knots an hour was too great a speed in which to proceed in a thick fog in that position, it would paralyze all the efforts of mercantile transactions, and that neither passengers nor goods could be properly conveyed across the Atlantic with a due regard to business and trade. Their lordships do not concur in that argument, and are of opinion that the lives of passengers and the safety of goods must be protected in the first place. Their lordships are of opinion that, even if these fogs should last longer than they are said to do, still the steamers must abate their speed, and if they do not they must take all the consequences of a collision."

The supreme court of the United States, in considering the same collision (19 Wall. 125, 133, 134, 22 L. Ed. 148), while holding the bark culpable in not giving the required fog signals, and therefore

liable for one-half the damages, condemned the steamer for running in the fog at the rate of seven knots an hour. And Mr. Justice Strong, speaking for the court, and referring to the steamer, said:

"And she ought to have apprehended danger of meeting or overtaking vessels in her path. She was only two hundred miles from Sandy Hook, in the track of outward and inward bound vessels, and where their presence might reasonably have been expected. It was, therefore, her duty to exercise the utmost caution. Our rules of navigation, as well as the British rules, require every steamship, when in a fog, to 'go at a moderate speed.' What is such speed may not be precisely definable. It must depend upon the circumstances of each case. That may be moderate and reasonable in some circumstances which would be quite immoderate in others. But the purpose of the requirement being to guard against danger of collisions, very plainly the speed should be reduced as the risk of meeting vessels is increased."

And answering the argument that the steamer could not be controlled or navigated safely at a lower rate of speed than seven knots an hour, the court said:

"And we do not think the evidence shows any necessity for such a rate of speed as the steamer maintained. It is true, her master, while admitting she was going seven knots, states that he don't consider she could have been steered going slower,—could not have been steered straight. And two other witnesses testify that, in their opinion, she could not have been navigated with safety and kept under command at a less rate of speed than seven miles an hour. These, however, are but expressions of opinions based upon no facts. They are of little worth. And even if it were true that such a rate was necessary for safe steerage, it would not justify driving the steamer through so dense a fog along a route so much frequented, and when the probability of encountering other vessels was so great. It would rather have been her duty to lay to."

The international regulations for preventing collisions at sea, which went into operation on July 1, 1897, and apply to this case, provide as follows:

"Art. 16. Every vessel shall, in a fog, mist, falling snow or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel, hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over." U. S. Comp. St. 1901, p. 2868.

This article does not relax the previous regulation a whit. The words "having careful regard to the existing circumstances and conditions," following the words "at a moderate speed," merely express what before was implied, as our above quotations from the opinions of the courts plainly show.

This article 16 was considered by the English court of appeal in the case of The Campania [1901] Prob. 289, on appeal from the judgment of Gorell Barnes, J., pronouncing the Campania alone to blame for a collision with the barque Embleton. The Campania, a large twin-screw mail and passenger steam vessel, was proceeding up the St. George's Channel in a dense fog at 9 or 10 knots an hour,—her full speed being 21 knots,—when she sighted the barque Embleton about 150 feet ahead, and, in spite of efforts to avoid her, struck her amidships, cutting her in two. It was contended on behalf of the Campania, and evidence was given to show, that her speed on this

occasion was moderate in the existing circumstances and conditions, as that speed was the lowest at which she could readily be maneuvered so as to avoid other vessels, and that, unless she was kept steaming continuously at about that speed, she could not be navigated with safety to herself, as there would be danger from uncertainty both in respect of her course and position. The decision of Barnes, J., against the Campania was put wholly upon the ground that the steamship was guilty of a breach of article 16, in that a speed of nine knots an hour in such a fog as prevailed was greatly excessive; and the contention that, because the steamship could not be safely navigated at a less speed than nine knots an hour, she was justified in keeping at that speed in a dense fog, was rejected. Barnes, J., cited with approval the remarks of Lord Hannen in the case of The Irrawaddy, and the remarks of Sir Charles Butts in the case of The Resolution. Lord Hannen, in the course of his judgment in the case of The Irrawaddy, said:

"I should add that, so far as I am able to form an opinion on this matter, it seems to me quite untenable to argue that a vessel is justified in going at the lowest rate she is constructed to go at, if that is not a moderate speed."

And Sir Charles Butts, in giving judgment in the case of The Resolution, said:

"I know it is said, and nearly always said in these cases, that large steamers cannot go below a certain rate, because, apart from the question of steerageway, the revolutions would be so slow that the engines would stop on the center. But if a vessel cannot reduce her speed sufficiently with the continuous action of her engines, and therefore cannot go at what would be a reasonable speed in a fog without occasionally stopping her engines, it is her duty occasionally to stop them."

The court of appeals affirmed the judgment of Barnes, J., expressing concurrence in the reasons stated by him for the decision. The rule of general application which the case of The Campania lays down (as correctly stated in the syllabus), is this: that, if a steam vessel in a fog cannot be continuously navigated at such a slow speed as will comply with the requirement of article 16, she must, in the absence of exceptional dangers of navigation, such as may arise from narrow waters or current, be stopped from time to time to take off her way.

In the still more recent case of the steamship Kincora against the steamship Oceanic, decided by the English court of appeal on June 18, 1902, which arose out of a collision in the Irish Channel in a dense fog, resulting in the sinking of the Kincora, it was held that the Oceanic's speed of 6⅓ knots an hour was not a moderate speed within the meaning of article 16.

Both the Biela and the Eagle Point were British vessels, and were subject to article 16 of the international regulations, which apply everywhere at sea to British vessels and to the vessels of all the principal maritime nations. The Campania, supra.

The testimony upon which the district court found that the Eagle Point could not be "properly controlled" at a less rate of speed than that at which she was going came from her master, chief officer, and third officer, who naturally sought to find excuse for her great speed in a dense fog. The statements of these witnesses upon this subject were mere unsupported opinions. They were not controlling, al-

though not directly contradicted. Little weight is to be given to such opinions. Besides, the master, in testifying, was speaking of the speed necessary "to keep the Eagle Point under the best control," and the chief officer of a speed necessary "to have her properly under control, to get out of the way of anything in a hurry." Evidently the witnesses had in their minds quick steerageway and the fullest control. But in whatever way they are to be understood, their testimony furnishes no justification for the Eagle Point's steaming continuously through the fog at the rate of eight knots an hour. The Pennsylvania, 19 Wall. 134, 22 L. Ed. 148; The Campania, supra. To lend a ready ear to such an excuse for high speed in a fog as the Eagle Point sets up would be to overlook the imperative language of article 16 of the international regulations, and tend to defeat its beneficial purpose.

It is our judgment that the Eagle Point, in the then existing circumstances and conditions, was going at more than a moderate speed, and was guilty of a breach of article 16 of the international regulations, and that this was a contributory cause of the collision. In holding the Eagle Point guilty of negligence, we follow the decision of the supreme court of the United States as well as the decisions of the English courts.

The answer, as a distinct defense, avers that, as both steamers were British vessels, the extent of the liability of the Eagle Point and her owner, if any liability exists, is to be ascertained in accordance with the British statutes and the maritime law, as construed and administered by the courts of Great Britain, and the damages assessed accordingly. The question thus raised was not considered at all by the district court. The argument in this court, in the main, related to the other questions in the case. We think, therefore, that we should not pass upon this question at this time, but that it should be referred to the district court for determination in the first instance.

The decree of the district court is reversed, and the cause remanded for further proceedings in accordance with this opinion.