## THE NO. 4.

### THE C. W. MORSE.

(Circuit Court of Appeals, Second Circuit.   May 11, 1908.)

#### Nos. 242, 243.

1. COLLISION—FOG—EXCESSIVE SPEED.
    Where two vessels were both under headway at the time of a collision between them in a fog, which occurred despite all efforts to avoid it after they became visible to each other, one or both must have been in fault for excessive speed.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 215.
    Collision rules, speed of steamers in fog, see note to the Niagara, 28 C. C. A. 532.]

2. SAME—STEAM VESSELS MEETING—MUTUAL FAULTS.
    A collision on the Hudson river opposite Thirty-Third street, New York, in a dense fog, between a steamer passing down and a meeting lighter, *held* due to the fault of both vessels; the steamer being in fault for excessive speed, which appeared from the evidence to have been not less than eight knots, and the lighter for inattention in failing to hear the fog signals of the steamer and to take measures accordingly to avoid a collision before the vessels came within sight of each other.
    [Ed. Note.—For cases in point, see, Cent. Dig. vol. 10, Collision, §§ 214, 215.
    Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

3. SAME—INLAND RULES—"NARROW CHANNELS."
    "Narrow channels," within the meaning of article 25 of the inland navigation rules (Act June 7, 1897, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]), are bodies of water navigated up and down in opposite directions, and do not include harbor waters, with piers on each side, where the necessities of commerce require navigaton in every conceivable direction. Tested by such rule, the Hudson river above Twenty-Third street, New York, and within the city limits is not a narrow channel.

Appeal from the District Court of the United States for the Southern District of New York.

Wallace, Butler & Brown, for the lighter.
Wheeler, Cortis & Haight, for the C. W. Morse.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge.   April 30, 1907, about 7:30 a. m., the side-wheel steamer C. W. Morse, on a trip from Albany to New York, 432 feet in length, 4,500 tons, with engines of 5,000 horse power, came into collision with lighter No. 4, about 115 feet long and of 457 tons burden.   The stem of the Morse penetrated the port side of the

lighter at a point about 38 feet from her stem to a distance of 8 feet, and the lighter sank almost at the point of collision, about opposite Thirty-Third street, some 375 feet from the line of the piers on the New York side. The collision occurred in a fog so dense that neither vessel saw the other until they were within a distance estimated by the various witnesses at from 100 to 400 feet. The district judge held that it was a case of inevitable accident, and his decree can be sustained only if no fault be discovered in either vessel.

Two witnesses from the lighter testified that she came down the river from Sixty-Fifth street at full speed in a clear space about 300 feet wide between the New York piers and a fog bank, but that when she reached Twenty-Ninth street the fog rolled up from the south so thick that she turned back to the company's slip at Thirty-Fourth street. On the other hand, many witnesses from the Morse testify that she had been blowing fog signals about every half minute all the way from 129th street down to the place of collision. The lighter also called some witnesses who were in slips and on piers near by, some of whom testified that they plainly saw the Morse as she passed down the river, and some thought they saw the collision distinctly anywhere from 600 to 1,000 feet off. But, this testimony being quite inconsistent with the testimony from either vessel and with the probability of a collision, we give it no weight. On the subject of the fog generally, we adopt the story of the Morse. We do not believe the lighter passed Thirty-Fourth street in clear weather and that she turned back at Twenty-Ninth street for a refuge. She had cargo to be delivered at Thirty-Fourth street, and we think she turned back when near Twenty-Ninth street because she had passed Thirty-Fourth street without knowing it.

We agree with the district judge that both vessels at the time of the collision had a little headway. If the Morse had been motionless, we do not think that the lighter, even if approaching at an angle of 30 degrees, could have pushed sideways with sufficient force to impale herself on the stem of the Morse to a distance of 8 feet. On the other hand, if the lighter had been motionless, the plates in the after part of the wound would not have been turned back as they were, and the stem of the Morse would not have been bent to port. Conceding that inferences from wounds in vessels are more or less conjectural, still the very plain indications on both boats incline us to think that each was in motion when they collided.

The first question on the subject of liability is whether the vessels were proceeding at a moderate speed, as required by article 16 of the inland regulations (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]) when they began to navigate with reference to each other. If each vessel had headway on, as we have found, one or both must have been at fault for failing to avoid the other within the space she was visible. This seems to be the definition of moderate speed adopted by the Supreme Court. The Nacoochee, 137 U. S. 330, 339, 11 Sup. Ct. 122, 34 L. Ed. 687; The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Chattahoochee, 173 U. S. 540, 548, 19 Sup. Ct. 491, 43 L. Ed. 801. Therefore the im-

portant inquiry, notwithstanding that each had come nearly to a stop at the time of collision, is what were their respective speeds before they began to try to keep clear of each other. Upon this vital question it is to be regretted that the testimony is so insufficient. In the case of the Morse there is no accurate testimony as to the time elapsed between passing any fixed point and the collision. Her witnesses do positively testify that her engines had been for some time working under one bell close shut off, which they say is as slow as they can be worked, except by hand. Although a careful experiment was made, showing that seven turns at full speed astern would bring the Morse to a stop when her engines were so working, no testimony at all was offered showing the speed she would be making under such conditions, which was the material question. The assistant engineer, who was working the engines, said he thought that she made 12 to 14 turns back between the time he got the backing bells and the time of the collision, which, in view of the experiment, would indicate that her engines must have been working at a greater speed than under one bell close shut off. He also testified that with 40 pounds pressure she would make from 10 to 12 turns with her engines so working. The diameter of her wheel being 32 feet, the circumference is 96 feet, and with 10 to 12 turns, making liberal allowance for all usual resistances, she cannot be brought under 8 knots an hour. Less than such a speed in fog has been held immoderate on the open ocean, and is a fortiori so in a crowded harbor. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; The Eagle Point, 120 Fed. 449, 56 C. C. A. 599, certiorari denied 189 U. S. 510, 23 Sup. Ct. 850, 47 L. Ed. 923; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687.

The engineer of the lighter was drowned, but the master says that she was going under one bell, which would ordinarily be 4 to 4½ miles an hour, but that in his opinion she was not at that time making more than 3 to 3½ miles, which seems to us a moderate speed. We are, however, quite convinced that the Morse had been blowing her fog whistle about once every half minute for some time before the collision, and that those on the lighter going down the river ahead of her, and after turning so as to meet her, should have heard it long before the two vessels had got into close proximity. If they had heard it there is every reason to suppose a collision would have been avoided. Only two persons have testified on the subject of the Morse's whistle from the lighter. The mate admits he heard one blast, while the master, who was with him in the pilot house, heard nothing until the alarm whistle immediately before the collision. It was not until then that the lighter's engines were reversed.

The suggestion is made that the progress of sound in fog is mysterious, and that there may have been areas of sound within which the Morse's whistle, though carrying much further, was inaudible to those on the lighter; but, there being evidence of deficient observation at least in the master, and as the Morse heard the lighter's whistle, and as the lighter was both going down ahead of and afterwards meeting the Morse, we are inclined to attribute the failure to

hear the whistle to inattention, rather than to any areas of inaudibility carried with her by the lighter. For similar reasons we think that the lighter had not sounded her own whistle as long as she ought to have done. Those on the Morse heard it twice immediately before the collision, and there is no reason to suppose that, if it had been oftener blown, they would not have heard it sooner.

Enough has been said to dispose of the case; but there are some other charges of negligence which we think is well to consider.

It is contended that the North river at the place of collision is a narrow channel, within article 25 of the inland regulations, and that therefore the Morse was at fault for not going down on the New Jersey side of the river. We have held in the Bee, 138 Fed. 303, 70 C. C. A. 593, that the upper bay, regarded as a whole, is not a narrow channel, but intimated that channels designated by the government might each be considered a narrow channel in respect to vessels moving up and down them; also in The Emma J. Rose, 145 Fed. 13, 76 C. C. A. 43, we have held that the Hudson river between Yonkers and the city line is a narrow channel, while, on the other hand, that between the upper bay and Twenty-Third street it is not a narrow channel. The Islander, 152 Fed. 385, 81 C. C. A. 511. The ratio decidendi of the latter case is that channels within the rule are bodies of water navigated up and down in opposite directions, and that therefore harbor waters with piers on each side, where the necessities of commerce require navigation in every conceivable direction, up and down, across, and up and down between piers on the same side, cannot be considered narrow channels. The only difference between the waters below Twenty-Third street and above it, within the city limits, is that the government has designated by buoys an anchorage ground from the west side to nearly midstream between Twenty-Fifth and Fourty-First streets. This would seem to be an additional reason for not applying the narrow channel rule, since its enforcement would require south-bound vessels to navigate through the anchorage ground, which, though lawful, is, when possible, to be avoided.

The lookout of the Morse was stationed immediately in front of the pilot house, some 65 feet abaft of the stem. As soon as the first signal of the lighter was heard he went forward, but was unable to see her. It was a manifest fault to station a lookout in such a place, but we do not think it contributed to the collision.

Both vessels being held at fault, and both having appealed, the decree of the court below is reversed, without costs, and with instructions to enter a decree for half damages and half costs, with the usual order of reference.