THE GEORGE F. RANDOLPH.

BALTIMORE & O. R. CO. v. CITY OF NEW YORK.

(District Court, S. D. New York.  October 21, 1912.)

1. COLLISION (§ 90*)—NAVIGATION RULES—NARROW CHANNEL RULE—NEW
    YORK BAY.
        The narrow channel rule, being article 25 of the Inland Rules (Act
    June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), applies
    to the main ship channel in New York Bay, between Governor's Island
    on the east and Bedloe's and Ellis Islands on the west, and within the
    meaning of such rule the channel does not include the anchorage grounds.
        [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 181–186, 196;
    Dec. Dig. § 90.*]

2. COLLISION (§ 100*)—INLAND RULES—VESSELS MEETING IN FOG.
        Article 18, rule 1 of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat.
    100 [U. S. Comp. St. 1901, p. 2881]), which requires steam vessels, when
    approaching each other end on or nearly so, to pass on the port side of
    each other, and to signify such intention by a short blast of the whistle,
    does not apply to vessels in a fog unless they can see each other.
        [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 213–215; Dec.
    Dig. § 100.*]

3. COLLISION (§ 102*)—STEAM VESSELS MEETING IN FOG—EXCESSIVE SPEED.
        A ferryboat, running from the Battery to St. George, Staten Island,
    in a fog, at a speed of not less than eight miles an hour, held in fault
    for a collision with a meeting car float in tow on the ground of exces-
    sive speed; and the tug with the tow also held in fault for being on the
    wrong side of the channel.
        [Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*
        Collision rules, speed of steamers in fog, see note to The Niagara, 28
    C. C. A. 532.]

In Admiralty.  Suit for collision by the City of New York, as
owner of the ferryboat Richmond, against the steam tug George F.
Randolph, the Baltimore & Ohio Railroad Company, claimant, with
cross-libel by claimant.  Decree finding both vessels in fault.

Archibald R. Watson, Carter, Ledyard & Milburn, W. H. Merritt,
and J. M. R. Lyeth, all of New York City, for city of New York.

Harrington, Bigham & Englar and D. Roger Englar, all of New
York City, for Baltimore & O. R. Co.

MAYER, District Judge.  Cross-libels have been filed against the
Randolph and against the city of New York for damages resulting
from a collision on December 13, 1911, between the municipal steam
ferryboat Richmond and a car float in tow of the steam tug George
F. Randolph.  The libels were tried together.

The city of New York contends:  (1) That the Randolph was
guilty of a violation of the narrow channel rule (rule 10 of the Pilot
Rules).  (2) That the Randolph, in violation of rule 4, was negligent
in failing to port her wheel when she heard the fog signals of the
Richmond.  (3) That the Randolph was guilty of negligence in not
stopping and reversing sooner.

The railroad company contends: (1) That the collision was due to the excessive speed of the Richmond. (2) That the Richmond failed to stop and reverse in season.

On the morning in question each boat was justified in starting on its journey. The Randolph set out on her trip up the bay from St. George, Staten Island, at 7:20 a. m.; the weather being sufficiently clear so that Robins Reef Light was visible a mile away. The Richmond started on her 7:40 trip from Manhattan to St. George at about 7:51 a. m. The collision occurred about 8:05 a. m.

The captain of the Richmond was an experienced ferryboat captain, and had often run between New York and St. George in foggy weather. He had many times taken the course which he took the morning in question, and was thoroughly familiar with it. That course was as follows: After clearing the ferry slip he ported his wheel to W. ½ S., and kept that course until he heard the horn at Castle William a little aft of his beam; then S. W. until abreast of the bell on the lower end of Governor's Island Wall; then S. W. ¾ S.; then ¼ of a point west on that course until the time of collision. The Richmond compass was undoubtedly trustworthy, and the course just outlined would put both craft on the westerly side of the channel.

The captain of the Randolph steered a course N. E. ½ N. from a point somewhere near a quarter of a mile off Robins Reef Buoy, as shown on the chart (Libelant's Exhibit 3) from A to AA. The float of ten cars was loaded to capacity, and while it is not clear whether the freight was iron, steel, or coal, the ends of the float were bound in iron.

Capt. Shannon, of the Randolph, was frank, and in effect admitted that his compass was not accurate. Upon all the facts, I am satisfied that the collision took place to the west of the middle of the channel, whether the channel is deemed to include the anchorage ground or not.

[1] The narrow channel rule undoubtedly applies to the main ship channel between Governor's Island on the east and Bedloe's and Ellis Islands, on the west. The La Bretagne, 179 Fed. 286, 102 C. C. A. 651. The Randolph claims, however, that the channel is the entire navigable channel, and not the space between anchorage grounds, and upon that theory that the Randolph was about the middle of the channel, and, therefore, was not violating the narrow channel rule.

I cannot concur with this claim, especially as applicable to navigation in a fog. Rules and regulations have been officially promulgated for New York Harbor, and certain anchorage grounds and channels have been laid out and charted. It is a contradiction in terms to hold that vessels may rely upon those rules, and anchor in a place of presumed safety, and yet, because the anchorage grounds is a part of the channel, be subject, in a fog, to collision and damage. While this precise question seems not to have been decided in any reported case, this view is impliedly sustained in The Mahanoy (D. C.) 126 Fed. 587, and I find nothing in The C. W. Morse, 161 Fed. 847, 88 C. C. A. 665, to the contrary.

200 F.—7

[2] 2. The city relies for its second proposition upon the applicability of rule 4 which is as follows.:

"Rule 4. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct ·blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other."

This rule certainly cannot be invoked in a fog, unless it can be shown that the vessel is seen dead ahead. A literal compliance with the rule, when vessels are uncertain as to the location of each other, might well lead to grave disaster.

[3] 3. The first contention of the railroad is that the collision was due to the excessive speed of the Richmond. The distance from the Battery to St. George was stated by the captain of the Richmond to be 4¾ to 5 miles. The chart (Exhibit C) shows that the distance in a straight line is fully 5 miles, and the course pursued by the Richmond was probably another quarter of a mile. On the trip of the collision the Richmond left the Battery about 7:51 a. m. and arrived · at St. George at 8:23 a. m.—32 minutes. If 2 minutes be allowed for time lost in collision, the Richmond made say 5 miles in 30 minutes, or at the rate of 10 miles an hour. As the tide was running about 2 miles an hour, the effect of the tide would be equivalent to 1 mile, so that the Richmond's speed must have been about 9 miles an hour, or, to be liberal, let us say 8 miles.

Computing another way, 14 minutes elapsed between departure and collision—7:51 to 8:05. Assume the collision to have happened about opposite the Greenville Buoy. The captain of the Richmond, at a time when the events were fresh in his mind, stated in his sworn report that it happened between the Greenville Buoy and Robins Reef, and he made the same statement to the superintendent of ferries.

His testimony on the trial on this point was very unsatisfactory, and it is manifest that his report, transmitted to the local board of steamboat inspectors, and his statement to his superior officer, contain his genuine belief as to the place of collision. The captain of the Randolph impressed me very favorably. He seemed anxious to tell the facts, even though they might be unfavorable to him—as witness his frankness as to the unreliability of his compass.

He testified that the collision happened below the buoy, and explained that his statement was based upon the length of time which it took him after the collision to reach the Greenville stake boat, which was just above the buoy. Of course, it is impossible for any one to say just where the collision occurred; but if, on this theory, we assume the place of collision as opposite the Greenville Buoy, then the distance was about 3¼ miles from the Battery on the course followed by the Richmond. In the elapsed time of 14 minutes, the tide, running 2 miles an hour, would have an effect equivalent to one-fourth of a mile. Deducting this one-fourth mile, the Richmond upon this theory must still have run 3 miles in 14 minutes, or at the rate of over 12 miles an hour. Making a liberal· allowance for errors on a the-

oretical computation, it would be difficult to arrive at less than 8 miles an hour, and thus to avoid the condemnation of such cases as The Somerville, 162 Fed. 681, 89 C. C. A. 473, and The No. 4, 161 Fed. 847, 88 C. C. A. 665.

On the other hand, I think the testimony satisfactorily establishes that the Randolph was going at a cautious rate of speed, certainly not more than 3½ miles an hour, and probably less. When the collision was imminent, each captain did the best he could in the emergency. I think the Randolph stopped and reversed as soon as she could, and so did the Richmond; but the difficulty was that the Richmond had been going too fast, instead of feeling her way, and therefore her headway could not be stopped in time to avoid the collision.

I think that the theory of the Randolph is right, and that, as the car float swung to port, her corner swung under the guard of the ferryboat, and the damage resulted from the forward motion of the ferryboat. If the Randolph's car float had been going ahead, the ferryboat would have been sunk. The nature of the damage confirms the theory of the Randolph that the collision occurred because of the forward motion of the ferryboat under her port helm, and that the only movement of the car float was the swing to port necessarily incident to her backing.

From the foregoing it is apparent that each boat was in fault. It is but fair to the captain of the Randolph to state that the unreliability of his compass was no individual fault of his, but that unreliability nevertheless put his boat on the wrong side of the channel. On the other hand, the captain of the Richmond, who was steering a course that had stood the test many times, and who was doubtless anxious, as far as possible, to keep his boat on schedule, ran her at a rate of speed which was unjustifiable in this fog.

Each boat was at fault, and it seems to me that the case is peculiarly one where the damage should be divided.