## THE NORTH AMERICA.

(District Court, E. D. New York. December 21, 1916.)

COLLISION ☞95(1)—Tows Crossing—Failure to Observe Crossing Rule.

A collision in New York Bay at night between two tows on hawsers, one passing up on the left side of the channel and the other crossing from the anchorage grounds to the west, *held* due solely to the fault of the crossing tug in crossing ahead of the approaching tow without signal, or observing the starboard hand rule, and without keeping a proper lookout. The other tug, although on the wrong side of the channel, *held* not in fault, since she was seen when at a distance by the crossing tug, and her position had nothing to do with the collision, which would not have occurred if the crossing tug had navigated properly and observed the rule.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. ☞95(1).]

In Admiralty. Suit for collision by the Central Railroad of New Jersey, owner of the lighter Mechanic, against the tug North America and the scow R. R. No. 8, with the tug Interstate impleaded. Decree for libelant against the tug North America.

Foley & Martin, of New York City, for libelant.

Harrington, Bigham & Englar, of New York City, for claimant of the North America.

Park & Mattison, of New York City, for claimant of the Interstate.

CHATFIELD, District Judge. This case arose from a collision between the derrick lighter Mechanic, loaded with a cargo of structural iron, and R. R. Scow No. 8, which was in tow of the tug North America, bound for the dumping grounds outside of Sandy Hook. The tug Interstate, with the Mechanic in tow on two hawsers 45 fathoms in length, left Arlington, N. J., at about 9:20 p. m. on the 4th of March, 1915. Passing out from the Kills, they proceeded with a flood tide around the Robbins Reef light and then up New York Bay toward the Hudson river. The pilot of the Interstate took a straight course toward the lights of Cortlandt Street ferry. Consideration of the chart will show that this would carry the boats along the westerly side of the main channel in the upper bay until a point was reached opposite Governors Island. This course would also pass near the easterly side of the anchorage grounds, which lie between the channel to the Pennsylvania terminal at Greenville and the channel to the Lehigh Valley terminal at Black Tom.

The North America had proceeded to an anchorage buoy located well within the anchorage just referred to, and apparently near the black buoy east of the Oyster Islands, in order to take to sea such scows as had been loaded and moored at this stake buoy. But one barge was ready, so the North America, which had left Pier 6, East River, at 10:30 p. m., took this single scow in tow and started out over the anchorage ground to turn down into the main channel and toward the Narrows.

Some of the witnesses located the stake buoy at a point some 1,200

or 1,500 feet further to the south. This does not affect the movements of the boats before collision, but makes it difficult to determine how far the Mechanic floated after the collision. It appears that when she finally overturned and sank, the iron comprising her cargo not only penetrated into the mud of the bottom, but held the Mechanic close by. This cargo was raised, and was found on a line between Bedloes Island and the lower part of Governors Island, or over half a mile to the north of where the collision would seem to have occurred.

There is no reason to suppose that the North America, with the No. 8 in tow, drifted (while getting under way) much to the north from the stake buoy, and it must be in any event concluded that the strong tide carried the Mechanic a considerable distance before she overturned. It will therefore be of no benefit to devote thought to fixing the precise place of collision, so far as distance up or down the bay is concerned.

The important question involving the place of the accident has to do with the side lines of the channel and of the anchorage grounds upon each side. The libelant's testimony is to the effect that the Mechanic and the Interstate were about in the middle of the deep water channel. Examination of the chart, taken into account with the set of the tide, when considered from the standpoint of the courses of the Interstate and the North America, make it substantially certain that the Interstate was not to the easterly of mid-channel, if mid-channel be held to mean the deep water space between the lines of the anchorage on each side.

This libel was filed against the North America by the owners of the Mechanic, for the damage to the Mechanic and the cargo, which was subsequently lifted from the bed of the bay at considerable expense, but thereby saving a total loss. The libelant charges fault against the North America in failing to keep a lookout, using too long a hawser, in turning under a port helm, so as to pursue a course down toward the Narrows, without regard to the rights of the Interstate and her tow, and in giving no signal whistles to indicate its course. The North America has brought in by petition the Interstate, alleging that the Interstate was at fault in proceeding up the left side of the deep water channel, in failing to observe proper lookout, so as to see that the North America was proceeding with a scow upon a hawser, instead of alongside, and in attempting to go too close under the stern of the North America before looking out for the management of its own tow.

The captain of the Interstate admits that, when he first saw the North America going across his bow with masthead lights indicating a tow, he proceeded as if that tow were alongside, intending to go astern of the North America. He admits that he then (observing the scow No. 8) sheered sharply to port, and then, steadying his helm, passed the No. 8 starboard to starboard, endeavoring in the meanwhile to drag the Mechanic around to the west, so as to prevent her drifting with the flood tide into the No. 8. He testifies that it was impossible to stop because of the tide. This would indicate that the tow was close to that of the North America at the time. The captain of the Interstate went ahead upon the assumption that the North America had him upon her starboard hand when they were upon crossing courses, that the North

America was the burdened vessel, and was bound to indicate a desire to cross the Interstate's bow, if her course was such as to cause interference with the course and speed of the Interstate. He held his course and speed until he saw that the North America was not observing his rights and that collision was imminent. But he goes further, and charges that the North America actually lengthened out its hawser before making the turn from the anchorage grounds into the channel, and that in making this turn it drew the scow No. 8 upon a curve to starboard, thus pocketing the Interstate and her tow, which were being carried by the flood tide and by the momentum from the Interstate's engines into the curve thus formed.

The captain of the North America, when the Interstate first approached, was out on the upper deck aft of his pilothouse attending to the lengthening out of the hawser. He went into the pilothouse just about the time that the Interstate made the sheer to port. Both he and the man at the wheel testified that the North America turned under a port helm. The helmsman testifies that this was done to avoid collision, but under the circumstances such a turn, against the flood tide, with a towing hawser, would be a detriment rather than a help in avoiding collision with a scow which was headed across the hawser.

Two propositions stand out plainly from the testimony: First, the Interstate was proceeding up the left side of what has been held to be a narrow channel (The Geo. F. Randolph [D. C.] 200 Fed. 96; The Bee, 138 Fed. 303, 70 C. C. A. 593); but she was observed by the North America, and her presence on the wrong side of the channel had nothing to do with the collision, if the North America was keeping a proper lookout, and if the North America proceeded so as to respect the rights of a boat upon her starboard hand while upon a crossing course. The cases cited hold that the presence of a boat navigating up the wrong side of the narrow channel is sufficient ground for fixing responsibility upon that boat, if the presence of the boat was the proximate cause of the collision, and if the boat misled thereby was interfered with, so as to make dangerous or impossible the showing of proper regard for the rights of those whom it should take into account. This is the rule even if at some time the boat on the right side of the channel has the other on her starboard hand near a bend. The Victory and The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519. It has been held in such cases as The Aller, 73 Fed. 875, 20 C. C. A. 79, and The Merrill C. Hart (D. C.) 162 Fed. 371, that boats have a right to proceed without embarrassment in and out from an anchorage. But this does not mean without care, lookout, and observance of rules.

It is evident that at some point the Interstate would have to pass from the left side of the channel across to the right side, and while in that position other boats would have to navigate with respect to its movements. It is no excuse for the North America to point out that the Interstate had come from Robbins Reef upon the wrong side of the channel, if that had nothing to do with the collision, and if the North America, either through failure to maintain a proper lookout or to give signals as to its movements, paid no attention to a boat upon its starboard hand and on a crossing course. The North America might

as well have decided at the time in question that it would punish the Interstate for being in the wrong place by running it down as to now excuse its own carelessness by saying that the Interstate should be blamed for violation of some rule that did not enter into the situation.

The other point which evidently stands out from the testimony is that the North America lengthened out its hawser to at least 50 fathoms before getting straightened out down the channel, and that it navigated without regard to any of the boats moving to the east or outside of the boats anchored, while proceeding to get its hawser out and while swinging around into the channel. The captain of the North America testifies that, when he ported his helm, he did not think of a collision, as the Interstate was 300 feet away.

It must be remembered that, although the Interstate assumed that the North America had a tow alongside, and hence did not turn out of its course when the North America was first sighted, nevertheless the Interstate was the privileged vessel, and had the right to maintain its course and speed, unless the North America intimated by whistle signals that it was crossing the bow of the Interstate and was intending to proceed to the starboard, so as to pass the Interstate starboard to starboard. If the North America had so indicated, and if the Interstate had accepted the signal, then the Interstate would have been at fault if it failed to keep out of the way of the North America's tow. But upon the facts at bar the North America was at fault, and the charge that the Interstate failed to maintain a proper lookout is not substantiated.

As the position of the Interstate upon the wrong side of the channel does not seem to have been the proximate cause of the collision, it follows that the libelant should have a decree against the North America, with costs, and that the petition of the North America against the Interstate should be dismissed, with costs.