## THE BREIFOND.

(District Court, S. D. New York. April 13, 1926.)

Collision ⟨⟩⟩100(2)—Collision between ferryboat and vessel anchored held due to excessive speed of ferryboat in dense fog.

Collision in dense fog between a ferryboat going from the city to Staten Island and a vessel anchored in the anchorage grounds near the Statue of Liberty *held* due to fault of the ferryboat in moving at a speed of 7 or 8 knots an hour, where there was a visibility of not more than 75 or 100 feet.

In Admiralty. Suit by the City of New York against the steamship Breifond; the Breifonds Dampskibs Aktieselskabet, claimant. Libel dismissed.

George P. Nicholson, Corp. Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., of counsel), for libelant.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for claimant.

KNOX, District Judge. In this case the city of New York seeks to recover damages from the steamer Breifond for injuries sustained by the ferryboat Queens through the collision of the two vessels in a fog on the morning of March 27, 1921.

At the time of collision the Breifond was at anchor within the anchorage limits, in the vicinity of the Statue of Liberty. The tide was ebb, and the steamer was tailing down the bay parallel with the channel. The ferryboat was en route from her Manhattan terminal to St. George, Staten Island. Her master's version of the boat's movements, and of what happened, is as follows:

"We left New York about 6:31 [a. m.] * * * and we had to let her run out of the slip half a minute, and then we headed down about west by south, and I guess I run down on that course. At that time you could see about 700 feet off the end of the rack, and I noticed the tugboat Leonard Richards. He was going down about abreast of me; there were no fog signals on Governors Island. On the north end of Governors Island they have a bell, and on the south end of Governors Island at that time they had a bell also; but there was no sound, and we run out on this

course I should say about 3 minutes or a little more. The reason I run out so long was that it had set in and was like fog banks, and I didn't want to get too close to the island, so I held her off on this course. From that course I held her down southwest by west. I guess I run on that course about a minute and a half or two minutes, and from that I changed the course again to southwest by south ¾ south. That was the course of the ferryboat Queens. We were proceeding down about half speed when the lookout sang out to go back on her. So just about the time he sang out to go back I looked ahead and saw this ship. So I figured she was about 75 feet or so from us and we were headed for her. She was making no sound of fog signals, and I didn't want to hit her, and, if I did, I didn't want to hit her head on. So I gave her a hard-astarboard wheel and hooked her up, to pass her. But I didn't have enough room to do that, as it turned out; but I didn't really hit the ship. I really hit it with a side swipe, and she had an anchor hanging out of the hawsepipe on the starboard side, and that caught our coaming on the upper boat deck, and did a lot of damage up there, and pulled our davits over, and lost our lifeboat; so just about the time I saw I couldn't clear, I stopped and backed and blew three whistles, because I knew the Leonard Richards was coming up under our stern, and I wanted to warn him that I was backing."

In answer to the question as to whether he saw any one on the Breifond, the master replied: "The only man I saw, just about after we hit and I laid there, there was a man came running up from back aft, and it didn't appear as though he was dressed; * * * but I hollered to him about ringing a fog bell, and there was no answer from him at all."

After saying that he was blowing fog whistles, and that the windows of the pilot house were open, the master went on to testify that he believed the course being steered would bring him clear of the anchorage, but he would not claim that he was "not too far back," or that he was in the proper place. He took that course because he heard no sound on Governors Island. He thinks the Queens was making 7 or 8 knots, or probably less, but not more than 8. A number of vessels were anchored close by the Breifond, but, according to the testimony of all the witnesses from the Queens, as well as that of two or three tugboat captains who were navigating in the vicinity, none of them were ringing fog bells.

Although the libel charges that the Breifond was lying in the channel, the only alleged fault that is now pressed is that she failed to ring her bell. While there is considerable testimony of a negative character that tends to support that contention, it is more than offset by equally credible testimony to the effect that the bell was being rung, and had been ringing from the time the fog became heavy about 20 minutes previous to the collision. It is also fairly certain that the fog bell on Governors Island had been ringing for substantially the same length of time. Contemporary official records corroborate the fact. In addition, it hardly seems probable that all persons in or about the scene of the collision, with the exception of the city's witnesses, were failing to discharge the duties incumbent upon them, and taking chances of being run down by passing vessels.

The evidence with respect to the sounding of signals is so strong that I think its comparison, in detail, with the city's contrary proof is unnecessary. The record satisfies me that the collision came about through no fault of the Breifond, but was primarily due to the high rate of speed at which the Queens was running through a heavy fog. When a vessel, by her own statement, has a visibility of only 75 to 100 feet, she has no business to be running through a harbor, and close to anchorage grounds containing numerous vessels, at the rate of 7 or 8 knots an hour. By a long line of cases, such speed, under the conditions that here prevailed, have been condemned. See The George F. Randolph (D. C.) 200 F. 96; The C. W. Morse (Lighter No. 4) 161 F. 847, 88 C. C. A. 665; The Somerville, 162 F. 681, 89 C. C. A. 473; The Bayonne, 213 F. 216, 129 C. C. A. 560.

Obviously, the Queens was off her course, and from the evidence which came into the case it may well be that the reason she got onto the anchorage grounds was through the unreliability of her compass. It had a deviation of one point to the easterward, but the master had no deviation card, and he had no recollection of the compass ever having been adjusted. It is sufficient, however, to dismiss the libel upon the evidence as to the speed of the Queens.

Libel dismissed, with costs.