# THE VICTORY.

## THE PLYMOTHEAN.

CANTON INS. CO., Limited, et al. v. CLAIMANTS OF THE VICTORY et al.

CLAIMANTS OF THE VICTORY v. CANTON INS. CO., Limited, et al.

(Circuit Court of Appeals, Fourth Circuit. May 28, 1895.)

### No. 113.

1. COLLISION BETWEEN STEAMERS IN CHANNEL—ARTICLE 21, WHERE APPLICABLE —COAST WATERS.

Article 21 of the international rules of 1885, requiring steamships to keep to the starboard side in narrow channels, as well as the corresponding provision in Rev. St. § 4233. applies to harbors and other navigable coast waters communicating directly with the ocean, and hence governs in the navigation of Elizabeth river leading to Norfolk harbor. 63 Fed. 631, affirmed. The Britannia, 14 Sup. Ct. 795, 153 U. S. 130, and the John King, 1 C. C. A. 323, 49 Fed. 469, followed.

2. SAME.

Two steamers colliding in the Elizabeth river below Norfolk in the daytime, when each had the other in full view, as they approached from opposite directions, *held* both in fault.—one for insisting on keeping to the side of the channel lying on her port hand, in violation of international article 21, and refusing to change her course or reverse until collision was inevitable, and the other for obstinately pursuing her course, though on the proper side of the channel, and failing to reverse after the other refused to assent to her signals: the fault of the other, however, being regarded as much the graver. 63 Fed. 631, modified.

**3. SAME—RIGHTS OF CARGO OWNERS—MUTUAL FAULT.**

The faults of the vessels are not chargeable to cargo owners, and, in cases of mutual fault, they are entitled to complete indemnity.

**4. SAME—DEGREES OF FAULT.**

Where both vessels are held in fault, but the fault of one is much graver than that of the other, the liability of each may be measured by the degree of its fault. *Held*, therefore, that, where there was great damage to cargo, the entire proceeds of the vessel most in fault would be applied to making it good, and that any deficiency should be supplied by the other vessel.

Appeals from the District Court of the United States for the Eastern District of Virginia.

These are appeals from the district court of the United States for the Eastern district of Virginia, sitting in admiralty.

On the 12th November, 1891, the British steamer Victory, in ballast, was proceeding up Elizabeth river on her way from Hampton Roads to Norfolk. The steamship Plymothean, on the same day, had left the pier at Lambert's point, and was proceeding to sea down Elizabeth river. She had a cargo of cotton. The Victory was an iron steamship, 338 feet in length, 38½ in breadth, drawing 17 feet aft and 13 feet forward. In officers and crew she had 31 men. The Plymothean was 216 feet long, 1,016 net tonnage, her cargo of 3,682 bales of cotton. Her officers and crew numbered 21. Each ship was in charge of a local pilot. The master of each steamship was on the bridge with the pilot, acting as lookout, and seeing that the pilot's orders were executed. Neither of the steamships had any other lookout. The channel from the pier at Lambert's point runs to the channel of Elizabeth river at an angle of about 45 degrees. At black buoy No. 9 in Elizabeth river, the channel of the river becomes nearly, if not entirely, straight, and runs due north from that buoy on a line to and beyond Craney Island light; the distance between the buoy and the light being 1⅛ miles. The uniform depth of the channel between these two points is 25 feet. At Craney Island the channel is 250 yards in width. At buoy No. 9 the channel is 400 yards in width. Outside of the channel on both sides thereof there are large spaces of water; that to the west side being 8 or 10 feet in depth, and on the east side of the channel more shallow. The Plymothean, coming from Lambert's point, had reached the angle of the channel at buoy No. 9, and, straightening out again, proceeded to sea under a ported helm, keeping to the starboard side of the channel. This was at 4 p. m. At the same time the Victory was seen in the channel of the same river opposite to Craney Island light, a mile and one-eighth off, under a starboard helm. She was about mid-channel, or perhaps to the eastward of mid-channel, and moving with the tide about six or seven miles an hour. The Plymothean was steaming against the tide at the rate of four miles an hour. They kept their respective courses without change until collision became imminent,—indeed, inevitable,—when each reversed engines and backed with all speed, but without avail. At 4:14 p. m. the stem of the Victory penetrated the port side of the Plymothean at her main bridge, inflicting so deep a wound that she had to be beached on the bank of the channel east of buoy No. 7. The owners of each of the steamships instituted proceedings seeking limitation of liability. The Victory has been appraised at $67,500. She claims to have sustained injury from the collision to the amount of $14,000. The Plymothean has been appraised at $33,000; her freight is valued at $11,871,— in all $45,000, and upward. The actual amount reduced by her proportionate amount of salvage expenses is $40,000. She claims damages arising from the collision to the amount of $42,000. The damage to the cargo is proved to be $72,000. Each steamship intervenes in the proceedings of the other, and claims damages for the collision. The owners of the cargo intervene in both proceedings, seeking to hold both vessels responsible. The district court held the Victory to be solely in fault, and rendered a decree against her, appor-

tioning the sum for which stipulation was given for her pro rata between the Plymothean and her cargo. 63 Fed. 631. Each party comes up to this court on appeal.

Wilhelmus Mynderse, of Butler, Stillman & Hubbard, for Canton Ins. Co.

Robert M. Hughes, of Sharp & Hughes, for the Victory.

Floyd Hughes, of Whitehurst & Hughes, for the Plymothean.

Before FULLER, Chief Justice, and GOFF and SIMONTON, Circuit Judges.

SIMONTON, Circuit Judge (after stating the facts). The experienced and learned judge who heard the case below, after a clear and full statement of the facts, held the Victory liable for the collision, because she violated the great rule of the road, "Keep to the right." He applied to her that rule as embodied in article 21 in the revised international rules and regulations for preventing collisions at sea, adopted and made the law of the United States by an act of congress March 3, 1885 (23 Stat. 438). The Victory, being in a comparatively narrow but deep channel, up which she was proceeding in full view of the Plymothean, coming down the same channel, and on the east side thereof, continued her course without change, notwithstanding the failure of the Plymothean to respond to her signals, thus making a collision inevitable.

Article 21 is in these words: "In narrow channels every steamship shall, when safe and practicable, keep to that side of the fair way or mid-channel which lies on the starboard side of such ship." The proctor of the Victory contends that this rule does not apply to the navigation of Elizabeth river, as it is not included in the term "upon the high seas or coast waters of the United States." But in the case of The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, the supreme court of the United States held this rule 21 binding upon vessels in the harbor of New York at the entrance of East river; and in The John King, 1 C. C. A. 323, 49 Fed. 469, the circuit court of appeals of the Second circuit reached the same conclusion, notwithstanding that article 23 of the navigation act appeared to be in conflict with the rule of the supervising inspectors in regard to navigation in New York harbor. The rules of navigation in the act of 1885 control all vessels on the high seas and coast waters of the United States. The cases above quoted evidently construe these words "coast waters" to mean harbors and other waters upon the coast communicating directly with the ocean. We would be led to the same conclusion, comparing the language used in the act of August 19, 1890 (26 Stat. 320). This act has not yet gone into effect, but it is in pari materia with the act of 1885, and is intended to modify and improve it. It also has an article 25, containing the exact provisions of this article 21, and it declares that the regulations must be followed by "all public and private vessels of the United States, upon the high seas and in all waters connected therewith, navigable by sea-going vessels." The act of 1885 excludes

from its provisions the harbors, lakes, and inland waters of the United States. It is not unreasonable to construe these words "harbors," "lakes," and "inland waters" of the United States as meaning the Great Lakes and their harbors and inland waters connected therewith, and such rivers as flow in the interior of the country at long distances from the sea. But whatever construction we may give to these words, if we conclude that the Victory, in Elizabeth river, was governed, not by the regulations of the act of 1885, but by the regulations theretofore in force, embraced in section 4233 of the Revised Statutes, we will find in those regulations the same rule prescribed which the learned judge enforced here, "Keep to the right." Not only so, but these regulations in article 21 prescribe that every steam vessel when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse. There can be no doubt that these two vessels were approaching each other, each stubbornly adhering to the same side of the channel, and that their movements involved the risk of collision.

It is contended that the Victory, in Elizabeth river, was under no special regulation requiring her to proceed on that side of the river channel to her right. But if she were not controlled by the regulation of the act of 1885, or by the regulation set forth in the Revised Statutes, she must have been under some rule established by custom. See The Vanderbilt, 6 Wall. 225. The record discloses no custom which authorizes a vessel in this river, proceeding down the channel, to select either side she pleases. We are of the opinion that the court below did not err in the conclusion as to the error committed by the Victory. But, in considering the right of the owners of the cargo to damages, we cannot reach the same conclusion which he did, exempting the Plymothean from all responsibility.

The record shows that the two steamships, at 4 o'clock, on a bright afternoon, came into collision in Elizabeth river, a broad and deep stream, with ample sea room for each vessel, each having seen the other in full and uninterrupted view when over a mile and an eighth apart. The Plymothean, it is true, was on that side of the river where she should be, and the Victory was on the wrong side of the channel. Yet, although the steamers were surely approaching each other, it was manifest that each doggedly kept her course without taking any precaution whatever until too late and when the pending collision became inevitable. The slightest change in the course of each or of either of them would have prevented the collision. It is true that the Victory committed a very grave error, and her fault is the greater, but this will not excuse the Plymothean. The rules of navigation leave but little room for mere conjecture in controlling the action of the master and pilot. Each of them has in his power the means of ascertaining with approximate certainty the intention and course of the approaching steamer. He must use them. "Notwithstanding the error committed by one of the two

vessels approaching each other from opposite directions, it did not excuse the other from adopting every proper precaution required by the special circumstances of the case to prevent the collision." Article 24, The Maria Martin, 12 Wall. 31; The Scotia, 14 Wall. 181. "If there be any uncertainty as to the intention of the approaching vessels, this of itself calls for the closest watch and the highest degree of diligence on the part of the other vessel in reference to her movements. It behooves those in charge to be prompt in availing themselves of every resource to avoid not only collision, but the risk of such a catastrophe." The Louise, 3 C. C. A. 330, 52 Fed. 885. As was said by Brett, M. R. (The Beryl, 9 Prob. Div. 137): "The basis of the regulations for preventing collisions at sea is for their instruction to those in charge of ships as to their conduct, and the legislature has not thought it enough to say, 'We have given you rules which will prevent a collision;' they have gone further, and said, 'For the safety of navigation, we will give you rules which will prevent risk of collision. It is not enough if you do only that which will prevent collision; we will give you rules which will regulate your conduct for the purpose of preventing even the risk of collision.' The words are not, 'if two ships are crossing with the risk of collision,' but 'are crossing so as to involve risk of collision.'" The Eleanora, 17 Blatchf. 88, Fed. Cas. No. 4,335.

We cannot find anything in this record which shows any precaution taken by the Plymothean when she saw the Victory disregarding her signals and obstinately pursuing her course. The only thing which she did was simply to repeat the disregarded signal. Even that was not done until it became too late to avoid a collision. Under these circumstances it is impossible to say that the Plymothean is free from fault. It certainly would not be equitable to allow her to go in and share on equal terms in the fund in this court with the cargo, which certainly was in no fault whatever.

The rights of the cargo owners differ entirely from those of the two steamships. They in no way shared in the faults committed, and they are entitled to complete indemnity, restitutio ad integrum. The Atlas, 93 U. S. 302; The Alabama & The Game Cock, 92 U. S. 695; The Virginia Ehrman & The Agnese, 97 U. S. 316. In this instance before the court, the cargo must be paid for in full by both vessels. This leads to the embarrassing question, how shall these damages be apportioned between these two vessels? Each of them, as has been seen, was in fault. But the judge who heard the case, and with his usual care and ability examined and weighed the testimony, came to the conclusion that the Victory was grossly in fault, so much so as to be the sole cause of the disaster. While not going to this length with him, this court fully concurs in his conclusion that the Victory was grossly in fault. The Plymothean was guilty of an act of omission. The course of the Victory seems almost willful. The Victory, no doubt, was the chief cause of the disaster. If the Plymothean had taken the precautions which she should

have taken, the disaster might have been prevented. Under these circumstances, it would seem to be manifestly inequitable to assess upon her one-half of the entire loss.

| | |
|---|---:|
| The loss to the cargo was | $71,000 |
| The damage to the Plymothean | 33,000 |
| The damage to the Victory | 14,000 |
| | $118,000 |
| Of which one-half is | $59,000 |
| The value of the Plymothean is | $40,000 |

The rule unquestionably is that, when both vessels are in fault, both must contribute to make good the damages. The Washington & The Gregory, 9 Wall. 513; The Connecticut, 103 U. S. 710; The Potomac, 105 U. S. 630. And the general rule, almost universal, is to divide the loss equally among the guilty parties, with this qualification: that, if one party is exhausted before the person injured is fully indemnified, the deficiency must be made up by the other party. The North Star, 106 U. S. 17, 1 Sup. Ct. 41; The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29; The Washington & The Gregory, supra; The Alabama & The Game Cock, supra. But this rule cannot be said to be inflexible.

In The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29, the question was suggested before the supreme court, but it was not necessary to pass upon it. The court says:

"Whether in a case like this [mutual fault] the decree should be for exactly one-half of the damages sustained, or might, in the discretion of the court, be for a greater or less proportion of such damages, is a question not presented for our determination on this record, and we express no opinion on it."

The application of an equal division of damages is said to be the "rusticum jus." Chancellor Kent applies to it that term. 3 Kent, Comm. § 231; Mars. Mar. Coll. (2d Ed.) p. 133. That is to say, it is an application of that sense of fair dealing and of justice imbedded in our nature, the conclusions of common sense, of a mind "abnormis sapiens." If the spirit of the rule be adopted, and the liability of each vessel be measured by its degree of fault, exact justice will be done by applying the stipulated value of the Victory to the loss sustained by the cargo, and by requiring the Plymothean to make up any deficiency, so that the cargo owners obtain complete indemnity.

The cause is remanded to the district court, with instructions to modify its decree in accordance with this opinion.