THE ISLANDER.

THE PHILADELPHIA.

(Circuit Court of Appeals, Second Circuit. March 12, 1907.)

Nos. 155, 156.

1. COLLISION—NARROW CHANNEL RULE—LOWER HUDSON.

So much of North river as extends from Twenty-Third street, New York, to the Upper Bay, along the shores of which on both sides there is a continuous succession of wharves and piers, and which is one of the most crowded parts of the port of New York, cannot be considered a narrow channel, within the meaning of article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883], requiring vessels navigating such channels to keep to the right-hand side of the fairway.

2. SAME—STEAM VESSELS MEETING—VIOLATION OF RULES.

A collision in North river between Twenty-Third street, New York, and the Bay, between a ferryboat going up and a steam lighter descending, which were approaching each other nearly head on, each being a little to the port side of the other, held, on conflicting evidence, to have been due solely to the fault of the lighter in crossing the signal of the ferryboat to pass port to port, and attempting to pass to starboard of the ferryboat in violation of rules 1 and 3 of article 18 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 100 [U. S. Comp. St. 1901, p. 2881]).

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 187–192.

Signals of meeting vessels, see note to New York Union S. S. Co. v. Erie & W. Transp. Co., 30 C. C. A. 630.]

Appeal from the District Court of the United States for the District of New York.

This cause comes here upon appeal from two decrees of the District Court, Southern District of New York, holding the ferryboat Philadelphia solely in fault for a collision which occurred about 8 a. m. January 4, 1906, in the North river between the ferryboat and the steam lighter Islander. The collision took place about 500 feet or more off the Hamburg-American piers at Hoboken, N. J. The ferryboat was bound from the slip at the Pennsylvania Railroad station in Jersey City to Twenty-Third street, New York. The Islander was bound from Thirty-Ninth street, New York, to Barren Island.

W. S. Montgomery, H. G. Ward, and Robinson, Biddle & Ward, for appellant.

La Roy S. Gove and James J. Macklin, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). The district judge did not discuss the conflicting testimony nor express any opinion as to the navigation of the respective vessels, otherwise than to hold that the narrow channel rule (article 25, Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]) applied, and that the ferryboat violated it by not navigating to the starboard side of the fairway or midchannel.

We have recently had occasion to discuss the applicability of the narrow channel rule in two different cases. The Bee and The Booth, 138 Fed. 303, 70 C. C. A. 593, and Rose v. The Benjamin Franklin,

152 F.—25

145 Fed. 13, 76 C. C. A. 43. Upon each occasion we carefully limited our rulings to the precise facts shown in the record. In the earlier case the Upper Bay of New York between the rivers and the narrows was held not to be a narrow channel, and in the later case it was held that the rule applied to the Hudson river opposite Yonkers and Ludlow. The authorities bearing on the application of the rule wi1 be found very fully set forth in Judge Holt's opinion in The Booth (D. C.) 127 Fed. 453. Except for a Canadian authority, to be referred to later, no new citation bearing upon the question is presented. Reference is made in the appellee's brief to The Brittania, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, and The John King, 49 Fed. 469, 1 C. C. A. 319, as holding that this rule is binding upon vessels at the entrance of the East river and in the North river off Twenty-Third street; the authority given being The Victory, 68 Fed. 395, 15 C. C. A. 490. The court in this last case, however, was misled by a change in the number of the rule. The old twenty-first rule (Act April 29, 1864, c. 69, art. 16, 13 Stat. 61 [U. S. Comp. St. 1901, p. 2898]), which the courts considered in the Brittania and John King Cases was that which required every steam vessel when approaching another vessel so as to involve risk of collision to slacken her speed, or, if necessary, stop and reverse. Neither court considered or discussed the narrow channel rule.

The locality now under discussion is so much of the North river as extends from Twenty-Third street to the Upper Bay. It is one of the most crowded parts of the port of New York, traversed continually by vessels of every type proceeding in every conceivable direction. The shores on each side are fully built upon. With the exception of the shoal water of Weehawken Cove and a few hundred yards along the high bank at Castle Point, there is an unbroken succession of bulkheads, wharves, piers, and slips upon both sides of the river. On each side of the river there is a contiguous series of long wharves (more extensive on the east than on the west side) known as the "Steamboat section," and applied to the uses of ocean steamers. A glance at the chart shows that there is not a street running to the river on either shore, which does not terminate in a pier, and in many places there are other piers between streets as well. We are clearly of the opinion that such a locality cannot be held to be a "narrow channel," within the meaning of such words as used in the rules of navigation. It may be noted that the Canadian courts have reached a similar conclusion as to the Inner Harbor of Boston, Mass. Lovitt v. The Calvin Austin, 9 Exch. (Canada) 160, affirmed 35 Sup. Ct. (Canada) 616.

It becomes necessary therefore, to examine into the circumstances attending the collision. The district judge states that he was at first inclined to hold both vessels in fault, because, approaching each other at the rate of 2,500 feet a minute, they did not exchange signals and begin to navigate relatively to each other until they had got so close together that reasonable time was not left for proper maneuvers. He reached the conclusion, however, that they were further apart than he at first supposed, and that the distance was "sufficient to enable them to avoid each other if they had maneuvered in time." We concur

in this conclusion, and are satisfied that no deficiency in maintaining lookout was in any way responsible for the catastrophe.

There is a very sharp conflict of testimony in the case upon the vital question of signals exchanged and helm movements, a conflict which must be decided one way or the other. In reaching a decision thereon, we are embarrassed by the circumstance that we have not seen or heard the witnesses, and have no information as to how the demeanor of any of them upon the stand impressed the district judge, since he did not discuss the general navigation, but based his conclusion solely on the narrow channel rule.

There seems to be no controversy that the facts prior to the blowing of the first signal were as follows: The ferryboat was bound up river. Several hundred feet ahead of her was the West Point, a Westshore ferryboat, bound in the same direction and a little on her starboard bow, so that, if the Philadelphia had been advanced on a projection of the line of her keel, she would have just about cleared the West Point, on her own starboard side. No other vessel was in the vicinity of the ferryboat on her starboard side. The Islander was bound down the river. About the time she was passing the West Point, she had the Philadelphia a little on her port bow, and at the same time she was herself a little on the port bow of the Philadelphia. If their respective courses had been unchanged, they would have cleared each other by a safe margin of from 50 to 150 feet. They were meeting almost head and head—that is "end on, or nearly so"—and their courses were not on the starboard of each other. Under article 18, Act Cong. June 7, 1897, rule 1, it was the "duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other." Moreover, under rule 3 of the same article, as amended and approved by the Secretary of the Treasury January 27, 1899, inasmuch as the vessels were approaching from opposite directions, each was forbidden to blow a cross-signal; that is, to answer one whistle with two or two whistles with one.

The West Point passed to eastward of the Islander at a distance estimated at from 100 to 200 feet. Between the Islander and the Jersey shore there was another ferryboat, not identified, also going down river. Her paddle box was almost abreast of the pilot house, and she was about 70 feet to the starboard.

Two witnesses from the Philadelphia testified that the Islander and West Point exchanged whistles before passing. The witnesses from the Islander deny this, and no one was called from the West Point. The circumstance is not of especial importance either way, since these two boats passed each other with a full margin of safety. The colliding boats came together so that the bow of the Islander struck the round bow of the ferryboat about four feet to the starboard of the line of the latter's keel. It is manifest that one, or the other, or both boats must have violated the article above cited, or such a collision could not have followed the position in which they were when they sighted each other. It seems clear, also, that there must have been a

greater change of heading than could have resulted during reversal from the operation of a screw or from the presence of a high southwest wind on the exposed stern of the ferryboat.

The contention of the ferryboat is that she blew first, a single whistle; that after a while the Islander answered with two, whereupon the ferryboat reversed and blew alarm whistles. That thereupon the Islander blew a single whistle, and immediately after alarm whistles. The contention of the Islander is that she blew first, a single whistle; that promptly, or after a while (her witnesses do not agree as to this), the ferryboat answered with two, whereupon the Islander reversed and blew alarm whistles. Each boat contends that at no time did it give a two-blast signal. It is an entirely proper assumption that the navigator who blew a signal operated his wheel in conformity thereto, so that, if we determine which one it was that blew a two-blast signal, we may safely conclude that he was the one who swung the head of his boat to port, contrary to the rule, and that to such improper navigation the accident was due.

From the ferryboat, three witnesses, the master who was navigating her, the wheelsman, and the upper deckhand all testify that the Islander crossed signals and navigated accordingly. And they are to some extent corroborated as to the whistles by the lower deckhand, who, however, did not see the other boat when she blew. From the Islander, two witnesses, her master, who was navigating, and the mate, testify that the ferryboat crossed signals and navigated accordingly. Mere preponderance in number of witnesses is, of course, of no importance. The ferryboat was the larger vessel, with many more persons on board who had opportunity to observe. After a careful study of the narratives of the respective witnesses, we cannot say, as to any one of them, that his testimony exhibits such discrepancies and contradictions as should lead to its rejection. Under these circumstances, there is nothing left but to inquire which of the two conflicting narratives is in harmony with the inherent probabilities. It seems to us entirely clear that under this test the story of those on the ferryboat is the correct one.

The ferryboat was bound north, meeting another boat end on, each on the other's port bow. To her own starboard hand there was open water entirely unobstructed till, at the distance of several hundred feet, there would be found the ice which a westerly wind had driven over to the east of midchannel. The West Point was a little to the starboard of the course of the ferryboat, but she was several hundred feet in advance and going faster. The ferryboat, although running up along the Jersey shore, was bound for Twenty-Third street ferry, on the New York shore. It would not have taken her out of her way to pass on the port side of the Islander, as the rule required. It would have taken her out of her way to work over to the westward, and so pass the Islander on her starboard side. There was no conceivable reason why she should not have kept on and passed port to port, as the rule required. The Islander, on the contrary, was moving between two other boats. On her starboard side was the unidentified ferryboat, of which her master says that she had been in company for some

time. "All along she was just gaining a little. By the time we got down close by the ferry, at the time of collision, she was about abreast of us." When she first appeared (further up river), he had starboarded his wheel until he got a safe distance from her, and then held it. This safe distance, however, was only some 70 feet, and it would, no doubt, seem rather risky to reduce it materially by porting. The other vessel on the Islander's port side, however, had just gone clear proceeding in an opposite direction, and the Philadelphia was still some distance away, far enough, if she would co-operate, to enable the Islander to pass her starboard to starboard, while there was abundant margin between the Philadelphia and the inside boat to make such a maneuver, so far as the latter was concerned, entirely safe. In view of the existing situation, we conclude that the narrative of those on the Philadelphia that the Islander blew a two-blast signal, and navigated accordingly, correctly states what took place, and that the Islander was therefore in fault for violating rules 1 and 3 of article 18.

We do not find any fault in the navigation of the ferryboat.

The decrees are reversed, with costs of this appeal, and the causes remanded, with instructions to decree in accordance with this opinion.