## THE PHILIP LEMLER, Inc. v. CITY OF NEW YORK.

No. 18947.

United States District Court
E. D. New York.
Jan. 26, 1953.

Foley & Martin, New York City, for libellant, James A. Martin and Warren ！J. Martin, New York City, of counsel.

Denis M. Hurley, Corp. Counsel, New York City, for respondent, Alfred T. Macre and Edwin M. Bourke, New York City, of counsel.

GALSTON, District Judge.

This action involves a collision between the diesel tanker Philip Lemler and the ferryboat Astoria, owned and operated by the City of New York. It is the claim of the libellant that the Lemler was proceeding on her course westerly to enter the main channel between North Brother Island and the Bronx shore, and while thus proceeding, the Astoria was seen to cross over some distance below on a course to pass between North Brother Island and South Brother Island, and thus passed out of view of the Lemler. The libellant alleges that the Lemler continued down through the main channel, and that suddenly the Astoria without notice or warning came out from behind North Brother Island, heading towards the Bronx shore. Thereupon the Lemler blew a signal of one whistle and, so the libellant complains, the Astoria answered with two whistles. Thereupon, again according to the libellant, the Lemler slowed down and blew another one-whistle signal, reversed her engines and sounded backing signals. At this point the Astoria blew danger signals, but continued ahead until she collided with the Lemler. It is thus claimed that the collision arose because of the fault of the Astoria.

The answer of the City of New York denies fault on the part of the Astoria, and contends that she left 134th Street Slip, Bronx, New York, on her regular trip to Rikers Island, and was proceeding on an easterly course about 100 feet off the northerly side of North Brother Island; that when the Astoria reached the oscillating green light of North Brother Island the Lemler appeared without notice or warning on the wrong side of the main channel, between the Bronx shore and the northerly side of North Brother Island. The answer further alleges that the Lemler blew one whistle, which the Astoria answered with one, and that then the Lemler blew two whistles and continued on towards the Astoria. At this point, says the answer, the ferryboat reversed its engines and blew danger signals, but the Lemler continued ahead until she collided with the Astoria.

Thus each charges the other with fault, and there are serious contradictions initially in respect to the signals given and exchanged.

The testimony adduced indicates that both the Lemler and the Astoria had originally intended to proceed through the east channel between North Brother Island and South Brother Island. Because of the presence of a slow moving tow proceeding westerly in this channel, and because each vessel saw the other approaching the channel from the opposite direction, both vessels altered their courses to take the main channel between North Brother Island and the Bronx shore.

In determining liability here, the factors presented for consideration are the place of collision, the headings of the vessels at the crucial time and the whistle signals exchanged.

Captain Larsen of the tanker Lemler, places the point of collision in midchannel, between the north end of North Brother Island and the Bronx shore, and almost due north of the flashing green light off the north end of North Brother Island. He indicated the heading of the Astoria at the time of the collision by the line X-Y on libellant's Exhibit 1, and the heading on the Lemler by the line L-Y on the same exhibit. The point at which the two lines meet, according to Larsen, is the place of collision.

Contrariwise, Captain D'Amico of the ferryboat Astoria places the point of collision between the flashing green light off the north end of North Brother Island and the red buoy No. 6. This buoy marks the North Brother Island side of the channel between North Brother Island and South Brother Island—the channel referred to by the witnesses as the east channel as opposed to the west channel. The place of collision, according to D'Amico, is where he placed the letter H on libellant's Exhibit 1. The course of the Astoria, as indicated by D'Amico, from the slip at 134th Street in the Bronx to the point of collision, is marked by the series of dotted lines on Exhibit 1.

The heading of the Astoria, as testified to by Captain Larsen, would have her going in a northeasterly direction and toward the New Haven terminal on the Bronx shore. But her destination, which was known to the Lemler's captain, was the ferry slip on Rikers Island, which is in a southeasterly direction from the north end of North Brother Island. Therefore, if Captain Larsen's version is to be believed, the Astoria was heading in a direction which would put her far off her normal course.

Captain D'Amico testified that when he rounded North Brother Island, he was about 150 feet from the sea wall of the Island, off his starboard side, at a point opposite the flashing green light. Larsen also stated that when he caught sight of the Astoria she was "fairly close" to the north shore of North Brother Island and to the port side of the Lemler. The evidence shows that the Astoria had open water to her starboard hand, entirely unobstructed to the sea wall. Since she was bound for Rikers Island, it would have been normal procedure, it seems, for her captain, upon rounding the north end of North Brother Island, to change his heading to the southeast, and this, according to D'Amico, was the course he pursued. This would have resulted in a head to head approach of the two vessels, making a port to port passing possible, as both captains agree. On the other hand, the heading of the Astoria as indicated by Captain Larsen, as has been stated, would take her far out of her way and over on the wrong side of the channel, as well as put her on a course which might require her to cross the course of the Lemler.

The place of collision, as indicated by D'Amico, is given greater credibility by the testimony of Captain Spicer of the New Haven tug Transfer No. 14, a presumably disinterested witness called by the libellant. Spicer places the collision, as he saw it, at the spot marked "SI" on libellant's Exhibit 1. This is between the flashing green light and red buoy No. 6 and just about where D'Amico marked the place of collision. Both Mulvey and Roden, respondent's witnesses who testified to seeing the collision from the ferry dock on Rikers Island, as well as Bryant, the deckhand on duty on the Astoria, place the collision between the flashing green light and the red buoy. It would seem incredible that a captain with the experience

of Captain D'Amico, 23 years as a captain in the Department of Marine Aviation of the City of New York and 35 years experience on City ferryboats, would navigate in such manner as to take the ferryboat so far off her normal course as indicated by the heading attributed to her by Captain Larsen. This is especially so in view of the fact that no special circumstances had yet developed indicating the possibility of danger which required any variance from the normal course usually taken. Taking all the circumstances into consideration, therefore, it must be concluded that the place of collision and the heading and courses of the vessels as testified to by Captain D'Amico, must be regarded as being more "in harmony with the inherent probabilities" and so more in consonance with the actual facts. The Islander, 2 Cir., 152 F. 385.

The narratives of the parties are even more conflicting in respect to the whistle signals exchanged. Larsen states that he blew one whistle, which, he said, was answered by the Astoria with two whistles. He states he then blew another one-whistle, which again was answered by the Astoria with two whistles. D'Amico denies the first two-whistle reply by the Astoria, stating that he answered the one-whistle signal of the Lemler with a one-whistle signal. According to his testimony, the Lemler then blew him a two-whistle signal to which he blew an answering two whistle signal. He conceded that though a port to port passing was called for here he answered the tanker's two whistles with two whistles, agreeing to a starboard to starboard passing, because there was plenty of room to accomplish such passage.

Captain Spicer of the New Haven tug states that when he first saw the vessels, "there was a lot of noise—blowing all kinds of whistles." He then stated he heard the oil tanker blow one whistle. He heard no answer, but a little later heard two whistles blown by the ferryboat and then two more blasts by the ferryboat's whistle. Sumbraz, a deckhand on the New Haven tug, stated that he heard the Lemler blow one whistle and the ferry-

boat blow two; then the ferryboat blew two whistles and again two whistles.

The only point of agreement among all the witnesses is that after the first exchange of signals, the only signal blown by the Astoria was a two-whistle signal. This being so, the Lemler was definitely on notice that the ferryboat was expecting a starboard to starboard passing. If Larsen's testimony is accepted that he blew a second one-whistle signal, then he knew that there was a lack of agreement as to signals for passing when he received a two-whistle reply. Consequently he should have blown an alarm immediately. Article 18, Rule III, Navigation Rules for Harbors, Rivers and Inland Waters, 33 U.S.C.A. § 203. So far as the evidence discloses, this was never done.

Larsen, as well as his deckhand, Svendsbo, states that the Lemler sounded a three-whistle signal, indicating full speed astern, after the Astoria blew her second two-whistle signal. The disinterested witnesses called by the libellant do not corroborate Larsen and Svendsbo, for neither Spicer nor Sumbraz testified to hearing any three-whistle signal from the Lemler. The Astoria did blow an alarm signal, which is confirmed by Spicer and Sumbraz, not because she thought there was a lack of agreement as to signals, but because the Lemler suddenly sheered to her starboard when the captain of the Astoria expected the tanker to keep to her port in accordance with the agreed upon starboard to starboard passing. No three-whistle signal was heard from the Lemler by those on the Astoria. The witnesses who were on the Rikers Island ferry dock did not testify with respect to the whistle signals. Not being seamen, of course, the signals would have had no particular import and would not be impressed upon their minds.

Of course, if the Astoria answered the Lemler's original one-whistle signals with two whistles, the ferryboat must be regarded as at fault for using "cross signals." National Motorship Corporation v. United States, 2 Cir., 171 F.2d 413. But D'Amico states, on the other hand, that his answering whistle signals were in agreement with the signals blown by the Lemler; and that

the tanker's second signal was one of two whistles for a starboard to starboard passing. Such a passage appears inconceivable if the place of collision and the headings of the vessels were as ascribed to them by Larsen. Thus the version of D'Amico must be considered the more probable, and the possibility of a starboard to starboard passing then appears not unreasonable. D'Amico's testimony is that the Lemler was about 200 feet away from Red Buoy No. 6 when he first sighted her. This would place the tanker on the port side of the channel for westbound vessels. The heading of the tanker as indicated by Captain Larsen, from the time she was "shaping up" to go through the east channel and then started up the west channel, as shown on libellant's Exhibit 1, also places the Lemler on the port side of the channel. That being so, a starboard to starboard passing would not necessarily take the ferryboat off her course. In attempting to get on the starboard side of the channel, or even to midchannel, the Lemler could have passed either to port or starboard of the Astoria.

With respect to the whistle signals, it is understandable that Spicer and Sumbraz may not be precisely accurate in the matter, since they were in no way concerned with the need to pay any attention to whistles from the vessels. Moreover, the two vessels were not brought to their attention until they began to hear whistles actually being blown. They are in agreement, however, that after the first series of whistles, the only passing signals they heard were two-whistle signals. Neither D'Amico nor Larsen states that the Astoria blew any more than one two-whistle signal. D'Amico states that after the first exchange of whistles the Astoria blew but a single two-whistle signal. Larsen does not contend otherwise. In the circumstances, although Spicer and Sumbraz thought that the two-whistle signals all came from the Astoria, it may well be that one of the two-whistle signals they thought was blown by the ferryboat was actually that of the Lemler.

Weighing all the evidence, and after considering the nature of the testimony given by the various witnesses—credibility of the stories told, the possible inconsistencies in them and the extent to which each was corroborated by others—it must be concluded that the respondent's version as to the whistle signals given must be accepted. Therefore, the Lemler cannot attribute fault to the Astoria for attempting a starboard to starboard passing, since the Lemler invited such passing.

The collision must be regarded as having resulted from the failure of the Lemler to navigate properly in attempting a starboard to starboard passing upon meeting the Astoria between the flashing green light off the north end of North Brother Island and Red Buoy No. 6, which marks the north side of the east channel between North Brother Island and South Brother Island.

The libel will be dismissed.

Appropriate findings of fact and conclusions of law will be filed with this opinion.