**110**

In the Matter of The Petition of Charles Francis ADAMS et al., as Massachusetts Trustees of Eastern Gas & Fuel Associates, and, as such Trustees, Owners of THE S. S. MELROSE for exoneration from or limitation of liability,

Charles Francis ADAMS et al., as Massachusetts Trustees of Eastern Gas & Fuel Associates, and, as such Trustees, Owners of THE S. S. MELROSE, for exoneration from or limitation of liability, Libelants,

v.

CONSTRUCTION AGGREGATES CORPORATION, Respondent.

United States District Court
S. D. New York.
June 25, 1954.

On Reargument Oct. 13, 1954.

Kirlin, Campbell & Keating, New York City (Robert S. Erskine, New York City, of counsel), for libelants.

Bigham, Englar, Jones & Houston and Hagen & Eidenbach, New York City (Leonard J. Matteson, Richard F. Shaw, New York City, Donald M. Waesche, Jr., New York City, of counsel), for claimant-respondent, Construction Aggregates Corp.

MURPHY, District Judge.

These matters having been tried to the court the following are made Findings of Fact:

1. At all times mentioned herein, libelants and petitioners were Trustees of Eastern Gas & Fuel Associates, a Massachusetts Trusteeship, with office for transaction of business in Boston, Massachusetts, and owners of the Liberty type steamship Melrose.

2. At all such times, respondent was a Delaware corporation with office and place of business within this judicial district, and owners and operators of the steamship Sandcraft, a sandsucker.

3. The collision giving rise to this litigation occurred sometime from 2:30 to 3:00 A.M. (D.S.T.) on July 2, 1950, in New York Harbor above Quarantine Station, between the Sandcraft, bound from Port Newark, New Jersey, to a point off Coney Island in order to suck up a cargo of sand there, and the Melrose on a voyage from Hampton Roads to Kearney, New Jersey, loaded with a cargo of coal. The collision resulted in total loss of the Sandcraft and damage to the Melrose.

4. The Sandcraft after emerging from Kill Van Kull, did not shape her course down the fairway to the Narrows. Instead, for some reason, excusable or otherwise, she proceeded inside the anchorage grounds which lie on the west side of the harbor along the shoreline of Staten Island from St. George to Rosebank, and passed an anchored vessel there between the west shoreline and that vessel. The Sandcraft continued within the anchorage grounds for about a mile in a tide which was running ebb at two knots. In order to avoid collision with another vessel, the Republic, anchored within the grounds, the Sandcraft directed its course to port so as to pass the bow of such vessel on the north. In view of the current, this necessitated bringing the Sandcraft to a heading east across the channel toward the Brooklyn shoreline. At this point the Sandcraft observed the Melrose to the south proceeding up channel.

5. The Melrose, proceeding north, upon observing the Sandcraft, sounded one-blast for a port to port passing. Upon receiving a two-blast response from the Sandcraft indicating alteration of that vessel's course to the left, the Melrose reduced its speed to slow ahead.

6. The Sandcraft maintained her course without alteration. When her bow came into line with that of the Melrose, with a distance of approximately 100 feet between the vessels, about a half-minute before the collision, the Melrose reversed its engines and sounded three-blasts. The bow of the Melrose collided head-on with the starboard stern quarter of the Sandcraft which sank in less than ten minutes.

7. The Sandcraft was at fault in delaying departure from the anchorage grounds until the precipitate hauling out to avoid collision with the anchored Republic, and also, thereafter, in failing to alter its course to the left after sounding a two-blast signal indicative of such maneuver.

8. The Melrose was at fault in failing to make timely reversal of its engines and sound the accompanying three-blast signal, after receiving the two-blast response from the Sandcraft.

9. The fault of both vessels specified in Findings 7 and 8 were proximate causes of the collision.

10. The fault of the Sandcraft contributed to the damage to both vessels to the extent of 80 per cent; that of the Melrose to the extent of 20 per cent.

## Discussion

Normally, in the approach of vessels at right angles or obliquely so as to involve risk of collision, the Pilot Rules (Former rule VII) would permit the Melrose as "the steam vessel which has the other on her own port side" to hold her course and speed, and require the *Sandcraft* as "the steam vessel which has the other on her own starboard side" to keep out of the other's way by starboarding so as to cross such other vessel's stern. Concededly, however, the present case is one of special circumstances which the same rule requires to be met "by blowing the danger signal, and both

steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."

In fixing fault upon both vessels rather than upon one of them solely, it must be kept in mind that immediately prior to the time when the collision became inevitable, each vessel with reasonable care and competence could have utilized her then existing ability to avoid the disaster: the Sandcraft, instead of maintaining her course directly across the Melrose's bow, by marked alteration of her course to the left, and indeed her two-blast signal indicated such maneuver; the Melrose, instead of maintaining her course at slow speed, by stopping and reversing as the Pilot Rules suggest, or altering her course to the left. Such maneuver by either vessel would probably have averted the result. Both vessels were at fault. Yet neither can be fairly said to have had a later opportunity than the other to avoid the harm. The "last clear chance" situations of maritime collision are distinguishable in that respect alone.[1] In addition there is no finding that the Melrose realized, or should have realized in the exercise of reasonable care, any helpless peril of the Sandcraft resulting from her attempt to avoid collision with the anchored Republic. There is an explicit finding that the fault of the Sandcraft in failing to alter her course to the left was a proximate cause, and not an antecedent one or a "condition", with respect to the collision.[2]

In assessing the relative degree of fault for each vessel, we think consideration should be given to the fault of the Sandcraft antecedent to her near encounter with the Republic.[3] She had entered the prohibited anchorage grounds, presumably to avoid collision with still another vessel, this one unidentified, but possibly also as a short-cut to her destination. She remained within them for almost a nautical mile, hauling out precipitately only to avoid the Republic. These were the conditions which made it appear unfeasible to the Sandcraft to comply with the Melrose's requested port to port passing, or to remain out of the Melrose's way and cross her stern. Added to such condition of peril due to her own faulty navigation was of course the proximate faults of her failure to alter course in conformity with her two-blast signal upon the approach of the Melrose. It is reasonable then to fix the greater fault on the Sandcraft, and the less on the Melrose.

### Conclusions of Law

1. This court has jurisdiction of the subject matter, vessels and persons.

2. The Sandcraft was at fault to the extent of 80 per cent.

3. The Melrose was at fault to the extent of 20 per cent.

4. The petitions for exoneration are denied.

5. Decree accordingly.

### On Motion for Reargument

On motion by respondent for limited reargument of that portion of the discussion, the findings of fact (number 10) and the conclusions of law (numbers 2 and 3) relating to the 80–20 per cent apportionment of damages, both sides appear in agreement that any division of damages upon the basis of comparative fault must be an even one. Alternatively, each side suggests application of the major-minor fault rule so as to cast all damages upon its adversary. We resist this suggestion, having found no situation where it is clear that the chief blame is on one side, while on the other there has been only some venial fault. Consequently, the choice lies between apportionment of damages according to the relative fault of the parties, found in this case at 20 and 80 per cent respective-

---

1. Cf. The Sanday (The Michigan) 2 Cir., 122 F.2d 325; The Cornelius Vanderbilt (The Watuppa) (The Hempstead) (The Essex No. 6) 2 Cir., 120 F.2d 766.

2. Cf. The Perseverance (The Winnetou) 2 Cir., 63 F.2d 788.

3. Cf. The Paris (Besseggen) D.C.S.D. N.Y., 37 F.2d 734, affirmed without opinion, 2 Cir., 44 F.2d 1018.

ly, and equal division of damages between the parties, regardless of their relative fault. Two questions arise: (I) which ought to be the rule; and (II) which is the rule.

**I**

The almost uniform doctrine in civil law jurisdictions [4] of apportionment of damages has been flatly rejected by the common law largely because juries lack devices for estimation of fault in percentiles.[5] Yet the justice of apportionment ought not to be denied for want of its precise measurement. Widespread criticism of the common law all-or-nothing rule has led to its abandonment by statute for certain cases in a few jurisdictions [6] and for all tort cases in others.[7] And in numerous federal statutes, the rule of apportionment of damages in negligence cases has been adopted.[8]

The admiralty rule urged in this case, of evenly-divided damages for injury to property, owes its inception to the same rationale as that of the common law in rejecting apportionment. In adopting this rule in 1824, Lord Gifford observed that "if your Lordships were to take any other rule, one cannot conceive any mode of properly apportioning the loss." [9]

Yet there is less basis for fear of haphazard apportionment in admiralty cases where fault lies on both sides than in comparable common-law situations. The trier of fact is a judge rather than the oft-maligned jury. While difficulty of precise measurement persists, the notion that in every such case the division should be in equal halves is no less capricious and arbitrary than insisting that the division be by quarters or thirds. "There may be occasions when blame is not correctly apportioned—perfection is not of this world. * * * Where the Court says one-third where it should have been one-fourth, it is a mistake of the Court:—and even the best judge is not beyond the reach of error. But where the judge, although seeing and saying that the faults are not at all equal is nevertheless compelled to make the burden of damages equal, justice fails." [10]

Practically every other leading maritime nation apportions damages according to relative fault in such cases,[11] including the British who abandoned their 87 year old rule of equal division in favor of the proportional one of the Brussels Convention.[12] The desirability of uniformity in maritime doctrines between this country and England,[13] is one consideration favoring the rule of proportional damages. Another more compelling one is the lack of uniformity between our judicially formulated maritime rule of proportional damages in personal injury cases and that of equally di-

---

4. E. g., Germany, Switzerland, France, Quebec, the Phillipines and Puerto Rico. But cf. Mathes v. Schwing, 169 La. 272, 125 So. 121.

5. See Prosser, Torts, 405.

6. Va.Code Ann.1919, § 3959, Code 1950, § 56–416; Ga.Ann.Code § 94–703, Civ. Code 1910, § 2781 (railway crossing accidents). See also Iowa Code, § 8158, I.C.A. § 479.124; Minn.Stat. § 4935, M.S.A. § 219.79; Wis.Stat. § 192.55(2, 3) (railway labor acts).

7. Miss.Code Ann. §§ 511, 512, Code 1942, §§ 1454, 1455; Neb.Comp.Stat. § 20–1151, R.S.1943, § 25–1151; Wis.Stat. § 331.045; Brit.Col.Stat. c. 8; New Bruns.Rev.Stat., c. 143, p. 1758; Novo Scot.Stat., c. 3; Ont.Stat., 20 Geo. V., c. 27, 21 Geo. V., c. 26.

8. Federal Employers' Liability Act, 45 U.S. C.A. §§ 51–60; Merchant Marine Act of 1920, 46 U.S.C.A. § 861 et seq.

9. Hay v. Le Neve [1824] 2 Shaw 395, 404 (H.L.).

10. Franck, Collisions at Sea in Relation to International Maritime Law, 12 L.Q. Rev. 260, 263 (1893).

11. See Ahlgren v. Red Star Towing & Transp. Co., 2 Cir., 214 F.2d 618, 621, n. 4.

12. Convention for the Unification of Certain Rules in the Matter of Collision, Art. IV, Third International Diplomatic Conference on Maritime Law at Brussels (1909–10); Maritime Conventions Act of 1911, 1 & 2 Geo. V, c. 57.

13. See Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 59, 71 S.Ct. 135, 95 L.Ed. 68.

vided damages in collision cases. Judge Learned Hand has raised the question "of our strange obstinacy in clinging to the division of damages and refusing to apportion them? This has become even more egregious, when we reflect that, where personal injuries are in issue, we do follow the more enlightened doctrine, now in force in most countries." [14] And when Congress has undertaken to prescribe rules of damages in some maritime situations of fault, these have been ones of proportional and not equal division of damages.[15] The patent injustice of equal division has led to judicial straining in some cases to let off entirely the ship only slightly to blame under a major-minor fault doctrine in collisions.[16] After a half-century of application in nearly all other leading maritime nations, the rule of proportional division has been found workable, not unduly burdensome upon triers of fact and not giving rise to a multiplicity of appeals.[17]

## II

Apart from choice of the more desirable rule, the pressing question is the authoritarian one of what that rule is. Until adoption of equal division of damages in collision cases by the House of Lords in 1824,[18] there had been a question in admiralty whether the rule was not one of apportionment.[19] Apportionment seems to have been the accepted rule whenever degrees of negligence could be ascertained. Equal division originated in a medieval rule applicable only to cases of "inscrutable fault." [20] There appears to have been considerable vacillation between the two rules in the United States for a number of years.[21] In the oft-cited The Max Morris,[22] a personal injury case, collision and non-collision cases of equal division and non-collision cases of apportionment were reviewed. "Whether in a case like this the decree should be for exactly one-half of the damages sustained, or might, in the discretion of the court, be for a greater or less proportion of such damages, is a question not presented for our determination upon this record, and we express no opinion upon it." [23] Chief Justice Fuller, who had joined in this opinion, sat on circuit in The Victory,[24] a vessel found "grossly in fault" in collision with another merely "guilty of an act of omission." A cargo damage claim was required to be satisfied first out of the limitation value of the vessel grossly at fault, and only then by requiring the other vessel "to make up any deficiency".[25] The decision was regarded abroad as an adoption of the rule of proportional damages in collision cases.[26]

14. Dissenting in Ulster Oil Transport v. Matton, 2 Cir., 210 F.2d 106, 110, 1954 A.M.C. 426, 433.

15. The Jones Act, 46 U.S.C.A. § 688; Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60; Merchant Marine Act of 1920, 46 U.S.C.A. § 861 et seq.

16. See Extract from Report of the Brussels Conference (of 1895), 53 Albany L.J. 44, 46 (1896); Mole and Wilson, A Study of Comparative Negligence, 17 Cornell L.Q. 333, 352 (1932).

17. See Huger, The Proportional Damage Rule in Collisions at Sea, 13 Cornell L.Q. 530 (1928).

18. Note 9, supra.

19. See Cayzer v. Carron Co. [1883] 9 A.C. 873, 881.

20. Franck, Collisions at Sea in Relation to International Maritime Law, 12 L.Q.Rev. 260, 263 (1896).

21. Griffin on Collision, 564 (collision cases on apportionment to 1929 collected). See also The Firenze, D.C.E.D.Pa., 1940 A.M.C. 28, 32.

22. 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586. Cited as authority for apportionment, at least in personal injury situations. Pope & Talbot v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202; American Stevedores v. Porello, 330 U.S. 446, 458, 67 S.Ct. 847, 91 L.Ed. 1011.

23. Id., 137 U.S. at page 15, 11 S.Ct. at page 33.

24. 4 Cir., 68 F. 395, 399.

25. Id., 68 F. at page 399–400.

26. See Scott, Collisions at Sea Where Both Ships are in Fault, 13 L.Q.Rev. 17 (1897); Franck, Collisions at Sea in Relation to International Maritime Law, 12 L.Q.Rev. 260 (1896).

On certiorari, the question of apportionment was escaped and the decision reversed on the ground that only one ship was at fault.[27] The opinion of the Supreme Court was—unusual to relate—by Chief Justice Fuller.

The rule of equal division of damages in collision cases has been referred to quite recently by the Supreme Court as "established admiralty doctrine".[28] Earlier positive announcements of the rule occurred in situations where both parties assumed that such was the doctrine,[29] or where there was "nothing stated sufficient to reopen the question, if there is one, as to changing the apportionment when there are different degrees of blame."[30]

It is true that this government has failed to ratify the Brussels Convention; yet it has been argued that such failure was due to a provision therein denying solidarity of obligation of joint tortfeasors to innocent third parties rather than to the rule of apportionment of damages in collision cases.[31] While Congress by statute unquestionably could adopt the rule of apportionment, the non-personal injury aspect of admiralty has been a field not occupied by legislation. "Not the least creative achievement of judicial law-making is the body of doctrines that has been derived from the brief words of the Constitution extending the judicial power 'to all Cases of admiralty and maritime Jurisdiction.' "[32] In its most recent expression on the rule of apportionment—in a case involving personal injury—the Supreme Court used this unrestricted language: "Exercising its traditional discretion, admiralty has developed and now follows its own fairer and more flexible rule which allows such consideration of contributory negligence in mitigation of damages as justice requires."[33]

 However, the Court of Appeals has made it clear that it is unwilling to adopt any other rule than that of equal division of damages in collision cases, "Nevertheless, we feel obliged to apply that rule until the Supreme Court or Congress instructs us otherwise."[34] Neither side in this controversy is willing to question that rule. Accordingly, this case affords no occasion for this court to adopt what it believes to be the more equitable principle in collision cases involving fault on both sides, viz., apportionment of damages according to relative fault.

On this limited reargument, finding of fact number 10 is amended to read:

"The fault of the Sandcraft contributed to the damage of both vessels as did that of the Melrose."

The conclusions of law (numbers 2 and 3) are amended so as to read:

"2. The Sandcraft is liable to the extent of one-half of the damages sustained.

"3. The Melrose is liable to the extent of one-half of the damages sustained."

27. 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519.

28. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 284, 72 S.Ct. 277, 279, 96 L.Ed. 318; United States v. Atlantic Mutual Insurance Co., 343 U.S. 236, 242, 72 S.Ct. 666, 96 L.Ed. 907.

29. The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91; The Atlas, 93 U.S. 302, 319, 23 L.Ed. 863; The Catharine, 17 How. 170, 58 U.S. 170, 5 L.Ed. 233.

30. The Eugene F. Moran, 212 U.S. 466, 476, 29 S.Ct. 339, 341, 53 L.Ed. 600.

31. See Robinson, Handbook of Admiralty Law 854.

32. Swift & Co. Packers v. Compania Colombiana Del Caribe, 339 U.S. 684, 690, 70 S.Ct. 861, 865, 94 L.Ed. 1206.

33. Pope & Talbot v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 204.

34. Ahlgren v. Red Star Towing & Transp. Co., 2 Cir., 214 F.2d 618, 621. See also Postal Steamship Corporation v. Southern Pac. Co. (Eastern Glade-Isleo), 2 Cir., 112 F.2d 297, 298.